The NATIONAL SHAWMUT BANK OF BOSTON, a corporation, Plaintiff,

v.

CORREALE MINING CORPORATION, a corporation,

Mart Lester and Ed Lester, individually and as partners doing business as Lester Coal Company, Defendants.

Civ. A. No. 1682.

United States District Court
S. D. West Virginia.

April 28, 1956.

Spilman, Thomas, Battle & Klostermeyer, Howard R. Klostermeyer, Charleston, W. Va., for plaintiff.

Richardson, Hudgins, & Hancock, Paul S. Hudgins, Bluefield, W. Va., for defendant Correale Min. Corp.

Crockett & Tutwiler, Joseph M. Crockett and J. Strother Crockett, Welch, W. Va., for defendants Mart Lester and Ed Lester.

MOORE, Chief Judge.

This action instituted by The National Shawmut Bank of Boston (hereinafter referred to as the Bank) against Correale Mining Corporation and Mart Lester and Ed Lester, doing business as Lester Coal Company (hereinafter referred to as Correale and Lester, respectively,) seeks the surrender of certain coal leases and an injunction restraining Lester from mining coal from the property embraced in these leases.

By an instrument dated February 21, 1944, the Bank leased to Hamill Coal Corporation (hereinafter referred to as Hamill) all the coal in the Cedar Grove seam underlying a 150-acre tract of land located in McDowell County, West Virginia, and in Buchanan County, Virginia. This lease was for a term of twelve years beginning January 1, 1944, with option to Hamill to renew for like periods of twelve years until the coal was exhausted.

On November 19, 1947, the Bank leased to Hamill 60 acres of coal in the Cedar Grove seam of an adjoining tract of land in Buchanan County, Virginia. In addition, the surface of a 100-acre tract was leased to Hamill to be used in connection with the mining operations. This lease was for a term of twelve years from its date with the same option to renew given to Hamill as in the 1944 lease.

Under both leases Hamill agreed to prosecute its mining operations in an

energetic, approved and skillful manner so as to thoroughly develop the premises in such a way as to secure the best yield of coal therefrom, and to remove all merchantable coal from the Cedar Grove seam that could be taken, consistent with a reasonable expenditure of money and the proper protection and safety of the mine. Also, Hamill agreed to pay to the Bank a tonnage royalty and an annual minimum royalty, the amounts of which are immaterial to the decision of this case.

By agreement dated July 22, 1948, Hamill assigned both leases and all its rights thereunder to Correale with the written consent of the Bank, and Correale assumed and agreed to perform all the covenants of the two leases binding upon Hamill. Further, by this agreement, the Bank granted to Correale the first opportunity to "strip mine" the coal in the Eagle and Splash Dam seams underlying the premises embraced in the two leases.

Thereafter, Correale entered into possession of the premises and operated thereon a single mine known as the Silver Ridge Mine, and paid the Bank royalties on all coal mined between July 22, 1948, and July 1, 1953.

By instrument dated March 10, 1953, Correale transferred to Lester the right to operate the Silver Ridge Mine as well as the right to use the tipple and other machinery and equipment belonging to Correale. This agreement was to remain in effect until all the merchantable Cedar Grove coal had been mined. Lester agreed to diligently and continuously prosecute the mining operation.

On June 28, 1953, the tipple used for the preparation and shipping of coal from the mine was destroyed by fire, and has never been restored or replaced. Since July 1, 1953, neither Correale nor Lester had conducted any mining operations upon the premises, nor has either of them paid the Bank any royalty.

Shortly after the tipple fire, Correale and Lester entered into negotiations concerning the restoration of the tipple, but these negotiations ended fruitlessly in August, 1953, when the parties were unable to agree on the terms under which the tipple would be rebuilt. Subsequently, the mining equipment was removed from the premises, and since early 1954, neither Correale nor Lester has maintained any caretaker or employee on the premises.

On December 29, 1955, counsel for Lester mailed to counsel for the Bank a notice of renewal of the 1944 lease for an additional term of twelve years, or until all the coal in the Cedar Grove seam had been removed. The following day counsel for the Bank replied by letter denying the right of Lester so to extend the lease.

It is undisputed in the record that the coal underlying the premises embraced in the 1947 lease has been exhausted. Thus, by its own terms this lease has expired. Although there have been various estimates, there now remains under the premises covered by the 1944 lease between 150,000 and 200,000 tons of merchantable coal.

Correale has no intention of rebuilding the tipple and resuming mining operations.

The Bank, asserting it is entitled to relief in this action, assigns the following reasons therefor, which are contested by Lester.

1. The transfer of interest between Correale and Lester of March 10, 1953, did not comply with the provisions of the 1944 lease, and therefore is invalid.

2. This transfer of interest from Correale to Lester constituted a sublease and not an assignment.

3. The attempted renewal of the 1944 lease on December 29, 1955, was ineffective.

4. The 1944 lease has been terminated.

I will discuss these arguments in the order in which they are listed.

1. The 1944 lease provided that it "* * * shall not be assigned or sublet to any person * * * who may be considered irresponsible, financially or otherwise." The comparable provision

of the 1947 lease was "* * * who may be considered *by the lessor* to be irresponsible, financially or otherwise." (Italics supplied.) The Bank contends that the italicized words are necessarily implied in the language of the 1944 lease and that the Bank's consent to any assignment or sublease was required under the language of both instruments.

Further, the bank argues that under the doctrine of Adams v. Shirk, 7 Cir., 1900, 104 F. 54, the "responsibility" provision of the lease requires the transferee to be of equal financial responsibility with lessee. That case is clearly distinguishable from the case before me. There not only did the lease expressly require consent of the lessor, but also provided that the assignee would be accepted by the lessor as a substitute tenant and the lessee would be excused from his contractual obligations. Quite properly the court held that before it would substitute an assignee for the lessee who had assigned his interest without the consent of the lessor, it would require his substitute to be of equal financial responsibility. Here there is no provision for substitution, and Correale remains bound by the covenants of the lease even though it assigns or sublets its interest to another.

■ Restrictions on transferring leases constitute restraints upon alienation and are subject to strict construction. Easley Coal Co. v. Brush Creek Coal Co., 1922, 91 W.Va. 291, 112 S.E. 512. Neither consent of the Bank nor financial responsibility equal to that of Correale was expressly required by the lease in question, nor will such requirements be inferred from the language employed. The only requirement was that the transferree be financially responsible, or, in other words, financially able to conduct the mining operations in the method contemplated. This Lester was able to do. I hold the instrument of March 10, 1953, to be valid and not prohibited by the terms of the lease.

■ 2. It is well established that the distinction between an assignment and a sublease is that by the former the lessee transfers his entire interest in the leased premises, or a part thereof, whereas in the latter he retains some interest in the premises transferred. Minor v. Pursglove Coal Mining Co., 1931, 111 W.Va. 28, 161 S.E. 425.

Correale was given the first opportunity to "strip mine" the Eagle and Splash Dam seams as well as the right to mine the Cedar Grove seam. Correale transferred to Lester only its right to mine the Cedar Grove seam until the coal therein was exhausted. In so doing Correale transferred all of its interest in a part of the premises it acquired by virtue of the 1944 lease, 1947 lease and 1948 assignment. This by itself would indicate that an assignment was made. However, by the instrument of March 10, 1953, Correale not only transferred the right to exhaust the Cedar Grove coal but also the right to use in conducting mining operations the tipple and other mining equipment and machinery owned by Correale. In the 1944 and 1947 leases the lessee is given the right to remove all machinery, tipples and other personal property within six months after termination of the leases, otherwise than by forfeiture. The March 10, 1953, instrument provides that upon termination or expiration "* * * Lester shall surrender said leased premises together with the aforesaid machinery and equipment to Correale * * *."

■ Correale did not transfer its entire interest in the property covered by the instrument of March 10, 1953. It owned the tipple, buildings, machinery, equipment, and other personal property and had the right to remove them after termination of its leases with the Bank. Correale did not sell this property to Lester but merely permitted them to use it in the course of the mining operations, and this use was reflected in the royalty paid Correale by Lester.

It is clear, therefore, that the instrument of March 10, 1953, was not as assignment, but a sublease.

■■ 3. Since there is no privity of contract between a lessor and a sublessee, it is generally stated that the latter can-

**184**

not exercise a right of renewal given to the lessee by the lessor, 51 C.J.S., Landlord and Tenant, § 58; 32 Am.Jur., Landlord and Tenant, 1423. Therefore, the attempted renewal of December 29, 1955, on behalf of Lester was ineffective, and the 1944 lease expired on December 31, 1955. However, even if the lease had not expired the Bank would be entitled to recover its property, for reasons which follow.

4. The 1944 lease required Correale to prosecute the mining operations in an energetic manner, and in a supplemental agreement entered into on April 15, 1951, Correale agreed to "* * * prosecute diligently and continuously mining operations under both of said leases * * *."

Since July 1, 1953, no coal has been mined on the premises and no royalties paid to the Bank. For a considerable length of time there have been no employees of any character on the property.

▪ A lessee cannot hold a lease without operating under it, and thereby prevent the lessor from developing the premises himself or leasing it to others. Martin v. Consolidated Coal & Oil Corporation, 1926, 101 W.Va. 721, 133 S.E. 626.

▪ Clearly, Correale has forfeited its rights under the lease. It states on the record that it has abandoned any idea of resuming mining operations on the premises.

▪ A subtenant has no greater rights against a landlord than the tenant, and the termination of a primary lease terminates the sublease. The Hawley Corporation v. West Virginia Broadcasting Corporation, 1938, 120 W.Va. 184, 197 S.E. 628, 118 A.L.R. 120. While it is true that a tenant cannot voluntarily surrender a lease to the prejudice of a subtenant, "When an unexpired lease has become subject to forefeiture and the lessee, under pressure from the landlord, surrenders to him possession of the leased premises, the surrender is not voluntary in the sense which would prevent it affecting the rights of a sublessee." The Hawley case, supra.

▪ Here the landlord, being entitled to claim a forfeiture for failure of the lessee to develop the property, insisted on a surrender by the lessee, and the lessee acquiesced in the surrender. Under these circumstances, the doctrine of the Hawley case applied.

Plaintiff may have an order requiring surrender of the lease, and an injunction as prayed for.