125 P.3d 499

Susan KIEHM, Plaintiff–Appellee,

v.

Ian ADAMS, Defendant–Appellant,

and

Does 1–10, Defendants.

No. 25411.

Intermediate Court of Appeals of Hawai'i.

April 30, 2004.

As Amended May 13, 2004.

Certiorari Granted June 15, 2004.

Elizabeth B. Croom, Chief Judge, on the briefs, for Defendant–Appellant.

James Sogi, Associate Judge, on the briefs, for Plaintiff–Appellee.

BURNS, C.J., and WATANABE, J.; and LIM, J., Dissenting.

Opinion of the Court by BURNS, C.J.

Defendant–Appellant Ian Adams (Adams) appeals from the judgment and order of the District Court of the Third Circuit, Judge Joseph P. Florendo, Jr., presiding, after a bench trial as follows: (1) the August 21, 2002 Judgment ordering Adams to pay $3,015.75 in damages to Plaintiff–Appellee Susan Kiehm (Kiehm) and (2) the August 29, 2002 Writ of Ejectment ordering the removal of Adams from the single family dwelling unit at 75–261 Pumehana Street, Kailua–Kona, Hawai‘i (the Dwelling Unit) owned by Kiehm. We vacate and remand for further proceedings consistent with this opinion.

## BACKGROUND

In early 2000, Kiehm orally rented the Dwelling Unit to Tammy Ayau (Ayau) on a month-to-month basis for $1,000 per month. Ayau agreed to pay for electricity and cable. Kiehm agreed to pay for water.

According to Ayau, she "had to find a roommate because [she] couldn't afford the $1,000, a month." In late 2000, by oral agreement, Adams became "that roommate that [Ayau] had contemplated[.]" Initially, and for some unspecified period of time during their co-occupancy of the residence, Ayau and Adams had a romantic relationship.

Ayau testified that she and Kiehm agreed to a termination of the Kiehm/Ayau rental agreement. Ayau also testified that, in a letter written and delivered to Adams on January 15, 2002, Ayau gave Adams notice of the termination of the Ayau/Adams rental agreement by informing Adams as follows: "Ian—Just to let you know so you have plenty of time, you have to be out of here by Feb. 28. I'm going to [be] moving out by the 20th and there is someone else moving in on the 1st of April."

Kiehm testified that Ayau moved out "[o]n March 28th" and that the new tenants, who were supposed to move in on April 1, 2002, were scheduled to pay $1,200 per month.

Adams testified, in relevant part, as follows:

Q Have you ever received notice—written notice from Ms. Kiehm that she wants to terminate your month-to-month lease?

A No I haven't.

Q Have you ever gotten anything in writing from Ms. Ayau telling you to move out?

A Um, several times—sometimes twice a week.

Q And what would be the gist of those notes?

A Because me and her weren't getting along and I've come home to ten-page letter and after the first twenty of them, I just started throwing them away. I wouldn't even read them.

Q Did any of those letters ever contain a notice that, uh, she was giving 45 days to terminate a lease?

A No.

[COUNSEL FOR ADAMS]: May the record reflect that I'm handing Mr. Adams a copy of Defendant's Exhibit "D", which has already been admitted into evidence and I'd like to ask you, Mr. Adams, um, if you, before today, have ever seen that letter?

THE WITNESS A No I haven't.

. . . .

A This doesn't look like her letter that she normally writes me because it doesn't have a bunch of swearing words in it like it normally does. This is totally unlike her.

. . . .

Q [S]o, do you believe that you've ever received a copy of this before today?

A No, absolutely not.

Adams also testified, in relevant part, as follows:

Q And, um, when you first moved in, how much was your rental payment?

A $500 per month.

Q And what is your rental payment now?

A $1,000 since [Ayau] moved out.

Q And did you try to make a rental payment in April?

A Yes I did.

Q And who did you try to make that payment to?

A To [Kiehm].

Q And do you recall what date that was?

A That was on the 29th.

. . . .

Q And did she accept the rental payment?

A No she didn't.

Q What did she tell you?

A She told me I had ... one day to get out and I told her I need at least couple weeks and she wouldn't have anything to do with it.

Upon the termination of the Kiehm/Ayau rental agreement, Ayau terminated electric and cable service. Adams refused to leave the premises. After water service was terminated for nonpayment of post-March 31, 2002 service, Kiehm instructed the water supplier not to supply water to the Unit absent a resident's written rental agreement with Kiehm.

After filing a Complaint on April 19, 2002, Kiehm, on May 28, 2002, filed a First Amended Complaint against Adams seeking a writ of possession, actual and punitive damages, and attorney fees and costs.

Adams filed a Counterclaim for damages for unlawful interference with Adams' use of the Unit, unfair or deceptive acts or practices in violation of Hawaii Revised Statutes (HRS) § 480–2, and emotional distress. Adams also sought "$100 plus attorneys fees as a penalty under [HRS] § 521–67 for [Kiehm's] violation of [HRS] § 521–43(f)." In his Counterclaim, Adams alleged that he was without utilities "from April 29 through May 7, 2002 (when utilities were restored in [Adams'] name pursuant to the Temporary Restraining Order Against Unlawful Utility Cut–Off or Diminishment filed on May 6, 2002 n S.P. No. 02–079KN)."

The $3,015.75 amount of the August 21, 2002 Judgment in favor of Kiehm was the total of $2,821.75 damages ($1,000 for each of April and May and $32.86 per day in June) plus $194 for court costs and sheriff's fees and mileage.

On August 21, 2002, the court entered Findings of Fact and Conclusions of Law (FsOF and CsOL). Using bold print to identify the FsOF and CsOL challenged by Adams in this appeal, the FsOF and CsOL state, in relevant part, as follows:

Having duly considered the evidence and legal arguments, the Court makes the following findings of fact:

. . . .

3. [Kiehm] agreed to rent the residence to [Ayau] for $1000 per month on a month to month tenancy approximately two and one-half years ago. This was an oral agreement.

. . . .

5. In approximately November 2000, [Ayau] entered into an agreement with [Adams] to rent part of the residence for $500 per month.

. . . .

7. [Kiehm] and [Ayau's] month to month tenancy was terminated by oral agreement effective March 31, 2002.

8. **[Ayau] notified [Adams] that their agreement would end at that time.**

9. [Ayau] received cash from [Adams] and deposited the rent into [Kiehm's] bank account.

10. After termination of the tenancy, [Adams] refused to move out.

11. **There was no agreement between [Kiehm] and [Adams].**

. . . .

### CONCLUSIONS OF LAW

1. A sublease is a transfer of part of the leasehold term or premises.

2. There is no privity between landlord and sublessee.

3. **[Kiehm] and [Adams] had no agreement.**

4. A landlord has no rights against a sublessee, and a sublessee has no rights against a landlord arising out of a landlord/tenant relationship.

5. When the month to month lease terminates, the sublease terminates.

6. [Adams] was not entitled to possession upon termination of the lease between Ayau and [Kiehm].

7. [Adams] is not entitled to damages against [Kiehm] for unfair and deceptive trade practices....

....

9. [Adams] is trespassing on the property owned by [Kiehm].

10. [Kiehm] is entitled to a judgment and a writ of ejectment against [Adams].

11. [Kiehm] is entitled to judgment in her favor on all [Adams'] counterclaims.

12. [Kiehm] is entitled to judgment against [Adams] for damages of $1000 per month from April 1, 2002 through and including June 25, 2002 (with per diem damages at the rate of $32.87 for those days in June).

13. [Kiehm] is entitled to her costs and service fees.

14. [Adams] is not entitled to damages against [Kiehm] for [Kiehm's] failure to disclose a local agent.

15. [Kiehm] is not entitled to punitive damages.

RELEVANT STATUTE

HRS Chapter 521 (1993 and Supp.2003) is Hawai'i's "Residential Landlord–Tenant Code" and it states, in relevant part, as follows:

§ 521–3 Supplementary general principles of law, other laws, applicable. (a)....

(b) Every legal right, remedy, and obligation arising out of a rental agreement not provided for in this chapter shall be regulated and determined under chapter 666 [Landlord and Tenant], and in the case of conflict between any provision of this chapter and a provision of chapter 666, this chapter shall control.

....

§ 521–6 Territorial application. This chapter applies to rights, remedies, and obligations of the parties to any residential rental agreement wherever made of a dwelling unit within this State.

§ 521–8 Definitions. As used in this chapter, unless the context clearly requires otherwise:

....

"Dwelling unit" means a structure, or part of a structure, which is used as a home, residence, or sleeping place by one person or by two or more persons maintaining a common household, to the exclusion of all others.

"Landlord" means the owner, lessor, sublessor, assigns or successors in interest of the dwelling unit or the building of which it is a part and in addition means any agent of the landlord.

....

"Premises" means a dwelling unit, appurtenances thereto, grounds, and facilities held out for the use of tenants generally and any other area or facility whose use is promised to the tenant.

"Rental agreement" means all agreements, written or oral, which establish or modify the terms, conditions, rules, regulations, or any other provisions concerning the use and occupancy of a dwelling unit and premises.

....

"Tenant" means any person who occupies a dwelling unit for dwelling purposes under a rental agreement.

....

§ 521–37 Subleases and assignments. (a) Unless otherwise agreed to in a written rental agreement ..., the tenant may sublet the tenant's dwelling unit or assign the rental agreement to another without the landlord's consent.

....

(c) A written rental agreement may provide that the tenant's right to sublet the tenant's dwelling unit or assign the rental

agreement is subject to the consent of the landlord.

. . . .

**§ 521–71 Termination of tenancy; landlord's remedies for holdover tenants.** (a) When the tenancy is month-to-month, the landlord may terminate the rental agreement by notifying the tenant, in writing, at least forty-five days in advance of the anticipated termination. When the landlord provides notification of termination, the tenant may vacate at any time within the last forty-five days of the period between the notification and the termination date, but the tenant shall notify the landlord of the date the tenant will vacate the dwelling unit and shall pay a prorated rent for that period of occupation.

(b) When the tenancy is month-to-month the tenant may terminate the rental agreement by notifying the landlord, in writing, at least twenty-eight days in advance of the anticipated termination. When the tenant provides notice of termination, the tenant shall be responsible for the payment of rent through the twenty-eighth day.

. . . .

(e) Whenever the term of the rental agreement expires, whether by passage of time, by mutual agreement, by the giving of notice as provided in subsection (a), (b), (c), or (d) or by the exercise by the landlord of a right to terminate given under this chapter, if the tenant continues in possession after the date of termination without the landlord's consent, the tenant may be liable to the landlord for a sum not to exceed twice the monthly rent under the previous rental agreement, computed and prorated on a daily basis, for each day the tenant remains in possession. The landlord may bring a summary proceeding for recovery of the possession of the dwelling unit at any time during the first sixty days of holdover. Should the landlord fail to commence summary possession proceedings within the first sixty days of the holdover, in the absence of a rental agreement, a month-to-month tenancy at the monthly rent stipulated in the previous rental agreement shall prevail beginning at the end of the first sixty days of holdover.

## DISCUSSION

### A.

HRS § 666–1 (1993) states as follows:

**Summary possession on termination or forfeiture of lease.** Whenever any lessee or tenant of any lands or tenements, or any person holding under the lessee or tenant, holds possession of lands or tenements without right, after the termination of the tenancy, either by passage of time or by reason of any forfeiture, under the conditions or covenants in a lease, or, if a tenant by parol, by a notice to quit of at least ten days, the person entitled to the premises may be restored to the possession thereof in manner hereinafter provided.

This provision recognizes that a sublessee (subtenant) is a "person holding under the lessee or tenant[.]" HRS Chapter 521 did not alter that subordinate relationship.

The definition of "Landlord" in HRS § 521–8 includes a "sublessor", the definition of "Tenant" in HRS § 521–8 includes a sublessee (subtenant), and the definition of "Rental Agreement" in HRS § 521–8 includes an oral sublease (subtenancy). Absent an agreement to the contrary in a written rental agreement between the landlord and the tenant, HRS § 521–37 permits the tenant to sublease without the landlord's consent.

HRS § 521–71(a) states that "[w]hen the tenancy is month-to-month, the landlord may terminate the rental agreement by notifying the tenant, in writing, at least forty-five days in advance of the anticipated termination[,]" and HRS § 521–71(b) states that "[w]hen the tenancy is month-to-month the tenant may terminate the rental agreement by notifying the landlord, in writing, at least twenty-eight days in advance of the anticipated termination." Clearly, these statutory rules apply to landlords vis a vis tenants and tenants vis a vis subtenants. Do these statutory rules apply to landlords vis a vis subtenants? Our answer is no. We con-

clude that Hawai'i's Residential Landlord–Tenant Code (1) does not require a lessor/landlord or a lessee/tenant to give notice to a sublessee/subtenant when terminating (in contrast to surrendering) the lease/rental agreement between the lessor/landlord and the lessee/tenant, and (2) does not change the rule that, in the absence of a contract to the contrary enforceable against the lessor/landlord, all subleases/sub-rental agreements are subordinate to the lease/rental agreement and terminate when the lease/rental agreement terminates (in contrast to when the lease/rental agreement is surrendered).

A lease of real property is both a conveyance of an estate in land (a leasehold) and a contract. It gives rise to two sets of rights and obligations- those arising by virtue of the transfer of an estate in land to the tenant (privity of estate), and those existing by virtue of the parties' express agreements in the lease (privity of contract). (See generally 6 Miller & Starr, Cal. Real Estate (2d ed.1989) § 18.17, p. 33.)

. . . .

In contrast to an assignment, a sublease is a transfer of only a portion of the tenant's estate, with the latter retaining a reversionary interest. Presumably, BACC [*BancAmerica Commercial Corp.*] would like to be characterized as a subtenant to come within the rule that a subtenant is not directly liable to the landlord, there being neither privity of estate nor contract (the sublease creates a new estate, and is a contract between the tenant and subtenant).

*Vallely Invs. v. BancAmerica Commercial Corp.*, 88 Cal.App.4th 816, 822–23, 106 Cal. Rptr.2d 689, 694–95 (2001) (internal citations omitted).

When the month-to-month term of the landlord-tenant rental agreement expires, what are the rights, if any, of the subtenant vis a vis the tenant and vis a vis the landlord? These questions cannot be answered without an understanding of the difference between a "surrender" and a "termination" of a rental agreement.

In landlord-tenant law, surrender exists when the tenant voluntarily gives up possession of the premises prior to the full term of the lease and the landlord accepts possession with intent that the lease be terminated. It differs from "abandonment," as applied to leased premises, inasmuch as the latter is simply an act on the part of the lessee alone; but to show a surrender, a mutual agreement between lessor and lessee that the lease is terminated must be clearly proved.

Black's Law Dictionary 1444 (6th ed.1990).

The following quote states the difference between a "surrender" of a lease and a "termination" of a lease:

The right of the sublessee to the possession of the premises, as against the original lessor, terminates with the lease or term of the original lessee, and since a subtenant holds the premises subject to the performance of the terms and conditions impressed upon the estate by the provisions of the original lease, the subtenant's rights are generally held to be terminated when the original lessor declares a forfeiture of the original lessee's term based upon the latter's nonperformance of obligations imposed on him or her. Thus, if the original tenant has incurred a forfeiture of his or her lease, and for that reason the landlord annuls the lease, the landlord is entitled to the possession as against the sublessee.

. . . .

The surrender of a lease by a lessee to his or her lessor, after a sublease, will not be permitted to operate so as to defeat the estate of the sublessee.

49 Am.Jur.2d, *Landlord and Tenant* §§ 1185–86 (1995) (footnotes omitted).

Adams challenges CsOL Nos. 5 and 6. Noting that Kiehm was the lessor/landlord, Ayau was the lessee/tenant, and Adams was the sublessee/subtenant, Adams contends that (1) Kiehm and Ayau agreed to a surrender of the Kiehm/Ayau rental agreement, and (2) the law will not permit that surrender to prejudice Adams. On that basis, Adams argues (1) that the surrender of the Kiehm/Ayau month-to-month lease/rental agreement did not terminate the Ayau/Adams month-to-month sublease/sub-rental agreement, and

(2) upon the March 31, 2002 effective date of surrender of the Kiehm/Ayau lease/rental agreement, "[Adams] became the immediate tenant of [Kiehm]" and entitled to proper notice prior to termination of his tenancy. Adams challenges FOF No. 8, contending that "[Ayau's] notice dated January 15, 2002 informs [Adams] that he is to vacate by February 28, 2002, and provides less than the required 45–days prior notice to terminate the sublease under Haw.Rev.Stat. § 521–71(a)."

Adams cites the following quote from *Reade v. IG Second Generation Partners, L.P.*, 184 Misc.2d 674, 708 N.Y.S.2d 273, 276–77 (2000), as authority that in a commercial lessor-lessee-sublessee situation, where the lessor and the lessee agree to a surrender of the fixed-term lessor-lessee relationship, the sublessee then becomes the lessee for the remainder of the fixed term.

The basic rules specifying the rights of parties when a sublessor voluntarily surrenders possession were set forth by the Court of Appeals in 1875 when it wrote in *Eten v. Luyster*, 60 N.Y. 252, 259 as follows:

"That surrender, and the consequent merger of the greater and lesser interest, terminated the original lease, and the term created thereby, as between the parties to the lease and the surrender.... But it was not competent for the lessor and lessee to affect the rights of third parties by a formal surrender of the lease. The interests and the terms of the subtenant of the lessee continued as if no surrender had been made. The defendants, the surrenderees and owners in fee, became the immediate landlords of the plaintiff (the sublessee), with only such rights as his lessor would have had to the possession of the premises before the expiration of the term.... Morrison (the Sublessor) could not sell,

give up, or surrender to the defendants anything that did not belong to him; and he could not terminate the lease to the plaintiff, or destroy his rights".

These principles remain good law today, with the issue often litigated being whether the surrender was voluntary, and if it is not then the sublessee's rights would fall as the provisions of a sublease are subject to the termination rights of a landlord set forth in a main lease.

"The effect of a voluntary surrender is equivalent to a transfer of the reversion, the interests of the landlord and tenant merge, and what remains is the landlord's fee subject to the subtenancy."

(Citations omitted.)

 The law is clear that a tenant of a dwelling unit can unilaterally terminate the term of a month-to-month tenancy on or after the twenty-ninth day after the tenant complies with the requirements of HRS § 521–71(b). The tenant having that unilateral power, we conclude that, in the absence of any contrary contractual obligation benefitting the sublessee/subtenant, (1) the tenant and the landlord, by oral or written agreement, may terminate their month-to-month rental agreement twenty-nine or more days later [1], and (2) the agreement between the tenant and the landlord to terminate their month-to-month rental agreement twenty-nine or more days later (a) is not a "surrender" of the rental agreement prior to its full term, but (b) is a termination of the rental agreement at the end of its full term.[2]

In this case, however, the court did not address the question whether the agreement by Ayau and Kiehm to terminate their month-to-month rental agreement occurred twenty-nine or more days prior to the agreed termination date. On remand, it must do so.

---

1. The landlord and the tenant can accomplish by oral agreement the same result the tenant could have unilaterally accomplished by compliance with Hawaii Revised Statutes (HRS) § 521–71(b) (Supp.2003). A writing is not necessary because, by definition, both the landlord and the tenant have notice.

2. Similarly, the law is clear that a landlord of a dwelling unit can unilaterally terminate the term of a month-to-month tenancy on or after the forty-sixth day after the landlord complies with the requirements of HRS § 521–71(a) (Supp. 2003). Such a termination (a) is not a "surrender" of the rental agreement prior to its full term, but (b) is a termination of the rental agreement at the end of its full term.

It will thereby decide whether the facts present a surrender of the Kiehm/Ayau rental agreement or a termination of the Kiehm/Ayau rental agreement. If the answer is yes, the facts present a termination. If the answer is no, the facts present a surrender.

There being no evidence of a contrary contractual obligation benefiting Adams, if the facts present a termination of the Kiehm/Ayau rental agreement on March 31, 2002, Adams' rights as a subtenant, which are subordinate to Ayau's rights as a tenant, terminated upon the termination of Ayau's rights as a tenant and Adams had no right to notice from Kiehm of the termination.[3]

If Adams had a contractual right to notice from Ayau of a termination of the Kiehm/Ayau rental agreement, (a) that right would not affect Kiehm's rights in this case, and (b) Adams did not assert any claims against Ayau.

### B.

In *Hawaiian Elec. Co., Inc. v. DeSantos*, 63 Haw. 110, 621 P.2d 971 (1980), Hawaiian Electric Co., Inc. (HECO), purchased the subject property from Bishop Estate subject to the rights of the tenants of twenty-one dwelling units. Over the course of time, tenants of nineteen of the dwelling units were replaced by other tenants without HECO's express permission. HECO sought to eject the tenants of those nineteen units. The Hawai'i Supreme Court reversed a lower court's decision in favor of HECO, concluding that (1) the fact that HECO had been accepting rent and tax payments from those nineteen tenants for more than ten years when it filed for summary possession estopped HECO from arguing that the nineteen tenants held possession without right, (2) as a result, the tenants were month-to-month tenants, and (3) HECO failed to give the nineteen tenants the statutorily required notice of termination of their tenancies.

Adams argues that

[the] Hawaii Supreme Court's decision in *DeSantos* is mandatory authority in this case and cannot be distinguished. [Adams] stands in the same position as the nineteen residents in *DeSantos* who had no express rental agreement. Month-to-month tenancies are created in both cases by the landlord's acceptance of monthly rental payments from the residents. In this case, undisputed facts show that [Adams] moved into the residence owned by [Kiehm] in November 2000 where he continuously paid rent through the end of March 2002. [Kiehm] knew that [Adams] was [Ayau's] boyfriend and that he had been living in the residence and paying $500 of the rent. Having accepted rental payments from [Adams] since November of 2000, [Kiehm], like HECO, must be estopped from arguing that [Adams] holds possession of her property without right. [Adams], like the residents in *DeSantos* without express rental agreements, has an implied month-to-month tenancy under Haw.Rev.Stat. § 521–22.

(Record citation omitted.)

We disagree that "[Adams] stands in the same position as the nineteen residents in *DeSantos* [.]" In *DeSantos*, tenants of nineteen of the dwelling units were replaced by other tenants who paid monthly rent directly to HECO. In contrast, Adams was merely a subtenant of only a part of the dwelling unit, was legally obligated to pay to Ayau only $500 per month, and did not challenge FsOF nos. 3 and 9. The contention that "[h]aving accepted rental payments from [Adams] since November of 2000, [Kiehm], like HECO, must be estopped from arguing that [Adams] holds possession of her property without right" has no basis in fact in this case.

### C.

Adams contends that HRS § 666–1 (1993) required Kiehm to give Adams ten

---

**3.** If a subtenant wants from the tenant notice of the termination of the landlord/tenant rental agreement, the subtenant must have such a requirement stated in the tenant/subtenant rental agreement. Absent the landlord's agreement to it, however, such a requirement will not have any impact upon the landlord's rights upon the termination of the landlord/tenant rental agreement, especially since HRS § 521–37(a) provides that "the tenant may sublet the tenant's dwelling unit or assign the rental agreement to another without the landlord's consent."

days' notice to vacate and Kiehm failed to give such notice. We disagree. HRS § 666–1 states as follows:

Whenever any lessee or tenant of any lands or tenements, or any person holding under the lessee or tenant, holds possession of lands or tenements without right, after the termination of the tenancy, either by passage of time or by reason of any forfeiture, under the conditions or covenants in a lease, or, if a tenant by parol, by a notice to quit of at least ten days, the person entitled to the premises may be restored to the possession thereof in manner hereinafter provided.

We conclude that Adams (1) was a "person holding under the lessee or tenant, [who held] possession of lands or tenements without right, after the termination of the tenancy, ... by passage of time[,]" and (2) was not "a tenant by parol" entitled to "a notice to quit of at least ten days[.]"

### D.

■ HRS § 521–43(f) (1993) states, in relevant part, as follows:

Any owner or landlord who resides without the State or on another island from where the rental unit is located shall designate on the written rental agreement an agent residing on the same island where the unit is located to act in the owner's or landlord's behalf. In the case of an oral rental agreement, the information shall be supplied to the tenant, on demand, in a written statement.

HRS § 521–67 (1993) states as follows: **"Tenant's remedy for failure by landlord to disclose.** If the landlord fails to comply with any disclosure requirement specified in section 521–43 within ten days after proper demand therefor by the tenant, the landlord shall be liable to the tenant for $100 plus reasonable attorney's fees."

Adams alleges that "[Kiehm] resides on the Island of Maui. On May 9, 2002, [Adams] requested that [Kiehm] provide the name and address of her designated agent on the Island of [Hawai'i] pursuant to [HRS] § 521–43(f) so he could serve her. [Kiehm] never responded." (Record citations omitted.) Adams contends that "[u]nder these facts, the Court should impose a fine of $100 and attorneys fees against [Kiehm] as authorized by [HRS] § 521–67."

In COL No. 14, the court decided that "[Adams] is not entitled to damages against [Kiehm] for [Kiehm's] failure to disclose a local agent." If, on May 9, 2002, Adams had no rights as a subtenant, COL No. 14 is right.

### E.

Adams challenges COL No. 7. It states that "[Adams] is not entitled to damages against [Kiehm] for unfair and deceptive trade practices."

HRS § 521–74.5 (1993) states as follows:

The landlord shall not recover or take possession of a dwelling unit by the wilful interruption or diminution of running water, hot water, or electric, gas, or other essential service to the tenant contrary to the rental agreement or section 521–42, except in case of abandonment or surrender. A landlord who engages in this act shall be deemed to have engaged in an unfair method of competition or unfair and deceptive acts or practices in the conduct of any trade or commerce within the meaning of section 480–2; provided that in addition to the penalties available under section 480–3.1, there shall also be minimum damages of three times the monthly rent or $1,000, whichever is greater.

HRS § 521–42(a) (1993) states, in relevant part, as follows:

The landlord shall at all times during the tenancy:

(4) Maintain all electrical, plumbing, and other facilities and appliances supplied by the landlord in good working order and condition, subject to reasonable wear and tear;

...; and

(6) Except in the case of a single family residence, or where the building is not required by law to be equipped for the purpose, provide for the supplying of running water as reasonably required by the tenant.

Assuming the credibility of the allegation by Adams that Kiehm willfully caused Adams to go without water and electricity for eight days, the dispositive question is whether Adams' tenancy had terminated prior to the deprivation.

## CONCLUSION

Accordingly, we (1) vacate (a) the August 21, 2002 Judgment, (b) the August 29, 2002 Writ of Ejectment, and (c) CsOL Nos. 4, 5, 6, 7, 9, 10, 11, 12, 13, and 14, and (2) remand for further proceedings consistent with this opinion.

Dissenting Opinion by LIM, J.

The foundation of the majority opinion is the determination that a sublease or assignment-of-lease relationship existed between Ayau and Adams. In my view, Ayau and Adams created a simple rent-sharing arrangement between themselves, with Ayau remaining and acting as the original and only tenant vis-'a-vis landlord Kiehm. Hence, Ayau's relinquishment of her tenancy—whether by surrender or by termination per the terms of the tenancy—bound Adams, Kiehm's purported forbearance of the situation notwithstanding. I would affirm, and therefore respectfully dissent.