126 P.3d 339

Susan KIEHM, Respondent/Plaintiff–Appellee,

v.

Ian ADAMS, Petitioner/Defendant–Appellant,

and

Does 1–10, Defendants.

No. 25411.

Supreme Court of Hawai'i.

Dec. 30, 2005.

Reconsideration Denied Jan. 19, 2006.

As Corrected Feb. 3, 2006.

MOON, C.J., LEVINSON, NAKAYAMA, and DUFFY, JJ.; and ACOBA, J., Dissenting.

Opinion of the Court by DUFFY, J.

On June 15, 2004, this court granted the application of Petitioner/Defendant–Appellant Ian Adams (Adams) for a writ of certiorari to review the published opinion of the Intermediate Court of Appeals (ICA) in *Kiehm v. Adams*, No. 25411, 109 Haw. 278, 125 P.3d 499, 2004 WL 926265 (App. Apr. 30, 2004).[1] Therein, the ICA vacated the August 21, 2002 judgment and August 29, 2002 writ of ejectment of the District Court of the Third Circuit (the court)[2] entered against Adams with respect to the property of Respondent/Plaintiff–Appellee Susan Kiehm (Kiehm) located in Kailua–Kona, Hawai'i. Op. at 286, 125 P.3d at 507. We now reverse the ICA's decision and affirm the judgment of the court.[3]

## I. BACKGROUND

### A. Facts

The following background is drawn from the court's undisputed findings of fact and from evidence adduced at trial. Kiehm is the owner and landlord of the subject property, a single family residence. In or around January 2000, Tammy Ayau entered into a oral month-to-month agreement with Kiehm to rent the residence for $1,000 per month.

In or about November 2000, Adams, Ayau's boyfriend at the time, moved into the residence and paid $500 per month to Ayau toward the rent. Ayau explained that she "had to find a roommate because [she] couldn't afford the $1,000 a month," but that she did not "sublet or assign [her] lease [with Kiehm] to [Adams]." Adams testified that he had no written or oral rental agreement

Elizabeth B. Croom, on the writ, for petitioner/defendant-appellant.

1. Chief Judge James S. Burns authored the opinion, joined by Associate Judge Corinne K.A. Watanabe. Associate Judge John S.W. Lim filed a dissenting opinion.

2. The Honorable Joseph P. Florendo presided.

3. This court reviews writs of certiorari for "(1) grave errors of law or of fact, or (2) obvious inconsistencies in the decision of the intermediate appellate court with that of the supreme court, federal decisions, or its own decision, and the magnitude of such errors or inconsistencies dictating the need for further appeal." Hawai'i Revised Statutes (HRS) § 602–59(b) (Supp. 2004).

with Kiehm. He added, however, that he did have an "agreement with [Ayau]," although he did not elaborate on the type of agreement. During the time Ayau and Adams lived in the residence, Ayau directly deposited both her and Adams' rent into Kiehm's bank account at First Hawaiian Bank.

Ayau recounted that on January 15, 2002, she delivered a letter to Adams notifying him that "he had to be out by February 28th, 2002," and that "there [wa]s someone else moving in on the 1st of April." Adams testified that Ayau often told him and wrote letters to him to move out, but "after the first twenty of them, [he] just started throwing them away. [He] wouldn't even read them." He added, "[Ayau] was constantly threatening to throw me out if I didn't do what she wanted me to do.... [The rental arrangement] was very unsecure [sic], you know." Adams further related that he had not seen Ayau's January 15, 2002 letter prior to the trial.

According to the court's undisputed finding of fact no. 7, "[Kiehm] and Ayau's month to month tenancy was terminated by oral agreement effective March 31, 2002." Ayau testified that she moved out at some unspecified time prior to March 31, 2002. After the end of the rental agreement between Ayau and Kiehm, Adams refused to move out. Kiehm and Adams both testified that on March 28, 2002, Kiehm told him to vacate the premises, but he refused to leave.

Ayau stopped the utility and cable service for the property at the end of the rental agreement. Kiehm then instructed the electric and cable company not to allow Adams or anyone else to restart service without a written rental agreement. Kiehm also stopped water service after the end of the rental agreement and instructed the water company not to allow Adams or anyone else to reinstate service without a written rental agreement.

## B. *Procedural History*

Kiehm filed suit against Adams on April 19, 2002 alleging that Adams was a trespass-

er and that he had no agreement to be on the premises. Kiehm asked the court for a judgment giving her possession of the property, damages equal to one month's rent, and a writ of possession directing a sheriff or police officer to (1) eject Adams from the property and all persons in possession of the property through Adams, (2) remove all personal belongings of Adams or any other person from the property, and (3) put Kiehm in possession of the property.

Adams counterclaimed on May 14, 2002 alleging that Kiehm (1) substantially interfered with his use of the property, (2) engaged in unfair or deceptive acts or practices in violation of Hawai'i Revised Statutes (HRS) § 480–2 (1993 & Supp.2002),[4] (3) maliciously threatened to evict him illegally by stopping his utility service, and (4) failed to disclose the identity of her designated agent for the property pursuant to HRS § 521–43(f) (1993). Adams sought money damages, attorneys' fees and costs, and further relief as the court deemed just and proper.

The case went to trial on June 4, 2002. At the conclusion of the trial, Kiehm argued that the evidence showed that Adams had at most a "permission to remain on the property [from Ayau]—not [a] landlord-tenant agreement [with Kiehm]." The court asked for supplemental briefs regarding "whether or not the landlord is liable to a sublessee under a sub-lease contract," and scheduled a post-trial hearing on that issue for June 25, 2002.

After hearing argument from the parties at the post-trial hearing, the court orally ruled in favor of Kiehm, finding that Adams was a trespasser once the Kiehm–Ayau oral lease terminated. The court entered its findings of fact (findings) and conclusions of law (conclusions) on August 21, 2002. The relevant findings were as follows:

> 3. [Kiehm] agreed to rent the residence to ... Ayau for $1000 per month on a month to month tenancy approximately two and one-half years ago. This was an oral agreement.

4. HRS § 480–2, entitled "Unfair competition, practices, declared unlawful," provides, in relevant part, that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful."

4. ... Ayau agreed to pay electric and cable. [Kiehm] agreed to pay for water service.

5. In approximately November 2000, ... Ayau entered into an agreement with [Adams] to rent part of the residence for $500 per month.

6. [Kiehm] was landlord and ... Ayau was the tenant.

7. [Kiehm] and Ayau's month to month tenancy was terminated by oral agreement effective March 31, 2002.

8. Ayau notified Adams that their agreement would end at that time.

9. ... Ayau received cash from [Adams] and deposited the rent into [Kiehm's] bank account.

10. After termination of the tenancy, [Adams] refused to move out.

11. There was no agreement between [Kiehm] and [Adams].

12. ... Ayau directed termination of the electric utility and cable service on termination of her tenancy. [Kiehm] then instructed the electric and cable companies not to allow [Adams] or anyone else without a written rental agreement to turn on the utilities in their name.

13. The water service terminated for nonpayment after termination of the lease. [Kiehm] then instructed the water company not to allow [Adams] or anyone else without a written rental agreement to turn on the water in their name.

14. There were no written agreements between ... Ayau, [Kiehm], or [Adams].

The relevant conclusions were as follows:

1. A sublease is a transfer of part of the leasehold term or premises.

2. There is no privity between landlord and sublessee.

3. [Kiehm] and [Adams] had no agreement.

4. A landlord has no rights against a sublessee, and a sublessee has no rights against a landlord arising out of a landlord/tenant relationship.

5. When the month to month lease terminates, the sublease terminates.

6. [Adams] was not entitled to possession upon termination of the lease between Ayau and [Kiehm].

7. [Adams] is not entitled to damages against [Kiehm] for unfair and deceptive trade practices.

....

9. [Adams] is trespassing on the property owned by [Kiehm].

10. [Kiehm] is entitled to a judgment and a writ of ejectment against [Adams].

11. [Kiehm] is entitled to judgment in her favor on all [Adams'] counterclaims.

12. [Kiehm] is entitled to judgment against [Adams] for damages of $1000 per month from April 1, 2002 through and including June 25, 2002 (with per diem damages at the rate of $32.87 for those days in June).

13. [Kiehm] is entitled to her costs and service fees.

14. [Adams] is not entitled to damages against [Kiehm] for [Kiehm's] failure to disclose a local agent.

15. [Kiehm] is not entitled to punitive damages.

Final judgment and the writ of ejectment were entered against Adams on August 21 and 29, 2002, respectively.

On September 20, 2002, Adams filed a notice of appeal from the judgment and the writ. On appeal, Adams challenged findings no. 8 and 11 (to the extent they were conclusions of law) and conclusions no. 3, 5, 6, 7, 9, 10, 11, 12, 13, and 14. Specifically, Adams argued that (1) "the [c]ourt should have held that there is a residential landlord-tenant relationship between Adams (as tenant) and Kiehm (as landlord) governed by [HRS chapter] 521[,]" the Residential Landlord Tenant Code (hereinafter, the Code), and that Adams "is a month-to-month tenant under [HRS] § 521–22[;]"[5] (2) the court

5. HRS § 521–22 (1993), entitled "Term of rental agreement," provides, in relevant part, that "[t]he landlord and tenant may agree in writing to any period as the term of the rental agreement. *In the absence of such agreement, the tenancy shall be month to month[.]*" (Emphasis added.)

should have made "[a] specific finding ... that Adams was not given the required notice to terminate his sublease with Ayau[;]" (3) Adams, and not Kiehm, is "entitled to possession" inasmuch as (a) "the voluntary termination of Ayau and Kiehm's lease does not terminat[e] Adams's sublease[,]" (b) by this "voluntary termination," Adams "bec[ame] the immediate tenant of Kiehm[,]" (c) "Adams is entitled to proper notice [from Kiehm] under [HRS] § 521–71(a) [6] before his month-to-month tenancy may be terminated[,]" and (d) "Kiehm failed to provide adequate notice to terminate Adams's tenancy[;]" (4) Adams is entitled to damages because "Kiehm willfully caused Adams to go without water and electricity for eight days" in "violation[ ] of HRS § 521–74.5 [(1993);][7] and (5) the "[c]ourt should have imposed a fine" against Kiehm for her failure to disclose a local agent to Adams as authorized by HRS § 521–67 [(1993)].[8]

In response, Kiehm contended that (1) Adams had no agreement with Kiehm when the Kiehm/Ayau month-to-month tenancy terminated on March 28, 2002; (2) Kiehm was entitled to evict and eject Adams under HRS § 666–1 (1993) [9] as a trespasser; (3) Adams' claims were properly dismissed inasmuch as Adams had no rights against Kiehm under the Code; and (4) Adams' sole recourse under the Code, if any, would have been against Ayau, but he failed to raise a claim against her.

In his reply brief, Adams asserted that (1) assuming HRS § 666–1 applied, Kiehm failed to give him the ten days' prior notice required to evict him; (2) even if Kiehm had given proper notice under HRS § 666–1, she failed to give him sufficient notice under the Code and specifically HRS § 521–71(a); [10] and (3) Kiehm's factual statements and references to the transcript of proceedings are so replete with errors that bad faith is suggested.

On April 30, 2004, the ICA issued a published opinion [11] in which the majority assumed without discussion that Adams was a sublessee of Ayau [12] and ruled that Adams'

6. HRS § 521–71(a) (1993) states as follows:
 When the tenancy is month-to-month, the landlord *may terminate the rental agreement by notifying the tenant, in writing, at least forty-five days in advance of the anticipated termination.* When the landlord provides notification of termination, the tenant may vacate at any time within the last forty-five days of the period between the notification and the termination date, but the tenant shall notify the landlord of the date the tenant will vacate the dwelling unit and shall pay a prorated rent for that period of occupation.
 (Emphasis added.)

7. HRS § 521–74.5, entitled "Recovery of possession limited[,]" provides, in relevant part, that "[t]he landlord shall not recover or take possession of a dwelling unit by the wilful interruption or diminution of running water, hot water, or electric, gas, or other essential service to the tenant contrary to the rental agreement or section 521–42, except in case of abandonment or surrender."

8. HRS § 521–67, entitled "Tenant's remedy for failure by landlord to disclose[,]" provides that "[i]f the landlord fails to comply with any disclosure requirement specified in section 521–43 within ten days after proper demand therefor by the tenant, the landlord shall be liable to the tenant for $100 plus reasonable attorney's fees."

9. HRS § 666–1, entitled "Summary possession on termination or forfeiture of lease," states:

Whenever any lessee or tenant of any lands or tenements, or any person holding under the lessee or tenant, holds possession of lands or tenements without right, after the termination of the tenancy, either by passage of time or by reason of any forfeiture, under the conditions or covenants in a lease, *or, if a tenant by parol, by a notice to quit of at least ten days,* the person entitled to the premises may be restored to the possession thereof in manner hereinafter provided.
(Emphasis added.)

10. *See supra* note 6.

11. Previously, on October 8, 2003, the ICA issued a memorandum opinion affirming the August 21, 2002 judgment and the August 29, 2002 writ of ejectment. On October 15, 2003, Adams filed a motion for reconsideration. On October 22, 2003, the ICA issued an order granting Adams' motion for reconsideration and vacating the October 8, 2003 memorandum opinion. On November 13, 2003, the ICA filed a second memorandum opinion, again affirming the court's judgment and writ of ejectment. On November 25, 2003, Adams filed a motion for reconsideration. On December 3, 2003, the ICA issued an order granting reconsideration and vacating the ICA's second memorandum opinion.

12. The ICA dissent, however, concluded that there was no sublease and maintained that the lower court's decision should be affirmed on that basis. 109 Haw. at 287, 125 P.3d at 508.

rights as a tenant depended on whether the primary lease between Ayau and Kiehm had been surrendered or terminated. 109 Haw. at 284, 125 P.3d at 505. The ICA reasoned that if Ayau had surrendered her lease prior to completion of a term, then Adams would have become the direct tenant of Kiehm entitled to possession; if, however, Ayau and Kiehm had agreed to terminate the lease as provided for by the Code, then the rights of the sublessee Adams would have been extinguished. 109 Haw. at 282–284, 125 P.3d at 503–505. The ICA thus vacated the judgment, the writ of ejectment, and the court's conclusions no. 4, 5, 6, 7, 9, 10, 11, 12, 13, and 14, and remanded the case with instructions to the court to determine whether Kiehm and Ayau agreed to terminate their month-to-month rental agreement twenty-nine or more days prior to the agreed termination date, explaining that "[i]f the answer is yes, [(the oral agreement occurred twenty-nine or more days prior to the agreed termination date,)] the facts present a termination" and "[i]f the answer is no, [(the oral agreement occurred twenty-eight or less days prior to the agreed termination date,)] the facts present a surrender." *Id.*, 109 Haw. at 285, 125 P.3d at 506.

On May 11, 2004, Adams filed a motion for reconsideration, which the ICA denied on May 13, 2004. On June 14, 2004, Adams made application to this court for a writ of certiorari, arguing that the ICA gravely erred "in concluding that an *oral* agreement between a residential landlord and tenant to end their month-to-month lease 29 days or more later results in a 'termination.'" (Emphasis in original.) While agreeing with the ICA's use of the surrender-termination distinction and the consequences of its application to the instant case, Adams asserts that "the Opinion incorrectly concludes that the distinction between a 'surrender' and a 'termination' depends only on whether or not the oral agreement was made at least 29 days before the ending of the lease, ... *disregarding the written notice requirement* ...." We

granted Adams' application on June 15, 2004, and now reverse the ICA's opinion, but not for the reasons advanced by Adams.

## II. STANDARD OF REVIEW

 "A trial court's conclusions of law are reviewed de novo, under the right/wrong standard of review." *Child Support Enforcement Agency v. Roe,* 96 Hawai'i 1, 11, 25 P.3d 60, 70 (2001) (quoting *State v. Ah Loo,* 94 Hawai'i 207, 209, 10 P.3d 728, 730 (2000)) (internal brackets and quotation marks omitted). It is well settled, however, that the appellate court may affirm a lower court's decision on any ground in the record supporting affirmance, even if not cited by the lower court.[13] *See State v. Ross,* 89 Hawai'i 371, 378 n. 4, 974 P.2d 11, 18 n. 4 (1998) ("An appellate court may affirm a judgment of the lower court on any ground in the record that supports affirmance.") (internal quotation marks and citation omitted).

## III. DISCUSSION

As the ICA dissent notes, "[t]he foundation of the [ICA's] majority opinion is the determination that a sublease ... relationship existed between Ayau and Adams." 109 Haw. at 286, 125 P.3d at 507. It is undisputed that Adams was a roommate of Ayau by agreement between those two parties, and was therefore a tenant as defined by the Code. *See* HRS § 521–8 (1993) (defining "tenant" as any occupant under a rental agreement and "rental agreement" as any agreement concerning the use or occupancy of a dwelling). However, it does not necessarily follow from that fact that the type of Adams' tenancy was a leasehold, as the ICA majority would have it. To the contrary, the Code and the common law of this jurisdiction compel the conclusion that Adams was not a(sub)lessee of Kiehm or Ayau, but instead a *licensee* of Ayau, as the ICA dissent suggests. Accordingly, we hold, for the reasons set forth below, that Adams, as the holder of a license revocable at will, became a tres-

---

**13.** The Dissent suggests that Kiehm's failure to argue that Adams was a licensee prevents this court from so holding. 109 Haw. at 309–10, 126 P.3d at 352–53. We disagree. As noted above, the appellate court may affirm the lower court's decision on any ground supported in the record. Here, the record supports the conclusion that judgment was properly granted in Kiehm's favor on another ground (*i.e.*, that Adams was a licensee).

**302**

passer as of the time at which the licensor Ayau's interest in the property ceased on March 31, 2002.

### A. The Relationship Between Ayau and Adams Was a License, Not a Sublease.

■ First, while it is true that HRS § 521–8 defines "rental agreement" extremely broadly, the Code also notes that it does not provide for all legal rights or obligations arising out of a rental agreement. HRS § 521–3(b) (1993). The logical conclusion to be drawn from the broad definition of "rental agreement" when juxtaposed against the Code's acknowledgment of rental agreements giving rise to rights not covered by the Code is that the Code contemplates tenancies or arrangements other than leaseholds. Indeed, the Code specifically states that it is supplemented by the common law. *See* HRS § 521–3(a) (1993) ("Unless displaced by the particular provisions of [the Code], the principles of law and equity, including the law relative to ... real property, ... supplement [the Code's] provisions."). As set forth below, the common law of landlord and tenant provides for tenancies other than leaseholds,

including licenses, and the Code has not displaced that law with respect to the tenancy found in the instant case.[14]

■ At common law, a roommate is not considered a sublessee.[15] *See Brewer*, 3 Haw. at 140 ("It was long since settled, that a covenant not to sub-let a tenement was not broken by taking lodgers[.]") (Citation omitted.). *See also* 49 Am.Jur.2d Landlord and Tenant § 1167 (1995) ("Since a roomer or lodger is not a tenant in the strict legal sense, it has generally been held that the taking in of roomers or lodgers by a lessee does not constitute a violation of a covenant or provision against subletting."). Instead, the rule is "well settled that an agreement by a lessee with a third person for the permissive use by the latter of the leased premises ... merely amounts to a *license* to use the property." *Id.* at § 1168 (citing cases) (emphasis added). In contrast to a lease, a license in the law of real property conveys no estate in land, is not assignable, and is revocable at the will of the licensor.[16] *Kapiolani*, 69 Haw. at 579, 751 P.2d at 1028–9; *Bush v. Watson*, 81 Hawai'i at 482–83 n. 11, 918 P.2d at 1138–39 n. 11.

14. The Dissent relies upon the "plain meaning" of the term "sublet" as synonymous with "lease" or "rent" based on the definition found in Merriam Webster's Collegiate Dictionary and the general definition found in Black's Law Dictionary. 109 Haw. at 307, 126 P.3d at 350. We believe, however, that with respect to legal terms of art such as "lease" and "sublease," reliance on general definitions is misplaced. Rather, (assuming for the moment that there is a need to consult a dictionary in the first place) a more appropriate definition to consult would be a more specific one. The Dissent characterizes the Ayau–Adams "sublease" as a month-to-month tenancy, 109 Haw. at 308, 126 P.3d at 351, leading us to consult the definition in Black's Law Dictionary entitled "Month to month lease." Under that header, however, the dictionary states: *"Tenancy where no lease is involved,* rent being paid monthly." Black's Law Dictionary (6th ed.1990) at 890 (emphasis added). In other words, the specific definition in this case suggests the opposite of what the Dissent contends; namely, the agreement between Ayau and Adams was *not* a lease in the legal sense. Ultimately, however, we believe there is no need to consult either a general or legal dictionary when there is case law in this jurisdiction on point. See the discussion immediately below of *Brewer v. Chase*, 3 Haw. 127 (1869); *Kapiolani Park Preservation Society v. City and County of Honolulu* [hereinaf-

ter, *Kapiolani* ], 69 Haw. 569, 751 P.2d 1022 (1988); and *Bush v. Watson*, 81 Hawai'i 474, 918 P.2d 1130 (1996).

15. We acknowledge that the Code defines "roomer" and "boarder." *See* HRS § 521–8 (defining roomers and boarders as tenants occupying dwelling units in a building in which the landlord resides and sharing one or more major facilities such as bathroom or kitchen). However, the Code's definition by its terms applies only to traditional boarding houses or other buildings with multiple discrete rooms; it does not address situations in which the landlord and tenant occupy *the same* dwelling unit. Thus section 521–8 is inapplicable on its face to the instant case and provides no basis for us to find that the Code displaces the common law principles governing roommate relationships.

16. This court most recently defined a license with respect to real property in *Bremer v. Weeks*, 104 Hawai'i 43, 85 P.3d 150 (2004). There, we noted that a license "denotes an interest in land in the possession of another which (a) entitles the owner of the interest to a use of the land, and (b) arises from the consent of the one whose interest in the land used is affected thereby, and (c) is not incident to an estate in the land, and (d) is not an easement." *Id.* at 68 n. 28, 85 P.3d at 175 n. 28 (quoting Restatement of Property § 512 (1944)).

■ Having previously recognized the common-law distinction between leaseholds and licenses, this court has followed the rule that whether an agreement is a license or a lease depends on the intention of the parties as ascertained from the nature of the agreement.[17] *Kapiolani*, 69 Haw. at 578–9, 751 P.2d at 1028–29; *Bush*, 81 Hawai'i at 486, 918 P.2d at 1142. In *Kapiolani* and *Bush*, this court listed several factors that a court should consider in determining whether an agreement is a lease or a license:

■ (1) Most importantly, does the grantee have the right to occupy a distinct and separate part of the premises (*i.e.*, a definite parcel)? *Bush*, 81 Hawai'i at 486, 918 P.2d at 1142 (citing 49 Am.Jur.2d Landlord and Tenant § 1161); *Kapiolani*, 69 Haw. at 579, 751 P.2d at 1029; *see also* 49 Am.Jur.2d Landlord and Tenant § 21 ("Exclusive possession of the leased premises is essential to the character of a lease .... There must be a conveyance of a definite space in order for a lease, rather, than a license, to exist; both the extension and the location of the space within the lessor's premises must be specified."); *Harkins v. Win Corp.*, 771 A.2d 1025, 1027 (D.C.2001) (essential distinction between roomers and tenants is whether the occupant has exclusive possession or control of the premises);

■ (2) Is the grantee's right to possession assignable (suggesting a lease) or is it a personal privilege (suggesting a license)? *Kapiolani*, 69 Haw. at 579, 751 P.2d at 1029; *see also* 49 Am.Jur.2d § 21 (same); and

■ (3) Is the agreement for a fixed term (suggesting a lease)? *Kapiolani*, 69 Haw. at 579, 751 P.2d at 1029; *see also McCandless v. John Ii Estate*, 11 Haw. 777, 788–89 (1899) (same); 49 Am.Jur.2d § 21 (same).

A consideration of these factors in the instant case leads to the conclusion that the agreement between Ayau and Adams was a license, not a sublease. First and foremost, as a roommate, Adams did not have exclusive possession of the property; rather, he shared possession with Ayau.[18] With respect to the second factor, although there is no written agreement or other direct evidence regarding the transferability of Adams' right to use the property, the circumstantial evidence (*e.g.*, previous romantic relationship; Ayau's testimony that she did not intend to sublease) leads us to conclude that Adams did not have the unilateral right to assign his interest in the residence (*i.e.*, Ayau did not grant Adams a right to bring in an additional roommate or a new roommate to replace him) and thus his privilege to use the property was personal. Third, the agreement between Ayau and Adams was not for a fixed term. Because each of these factors points toward the existence of a license,[19] we hold

17. The Dissent attempts to distinguish case law cited by the majority both within this jurisdiction (*i.e.*, *Kapiolani* and *Bush*) and without (*i.e.*, *Harkins*) as being factually distinguishable in that those cases dealt with non-residential scenarios. 109 Haw. at 308, 126 P.3d at 351. A review of cases from other jurisdictions persuades us, however, that the lease-license distinction is equally applicable in a residential context. *See 445/86 Owners Corp. v. Haydon*, 300 A.D.2d 87, 751 N.Y.S.2d 456, 457 (N.Y.A.D. 1st Dept.2002) (at-will occupancy of apartment constitutes license rather than sublease); *Har Holding Co. v. Feinberg*, 182 Misc.2d 180, 697 N.Y.S.2d 903, 904 (1999) (finding that roommate who remained in the apartment after lessee tenants had vacated was a licensee not entitled to possession as against the landlord); *Schell v. Schell*, 74 Cal. App.2d 785, 169 P.2d 654, 656 (4th Dist.1946) (lodgers in the home of another are licensees rather than lessees).

18. As indicated above, it is in this area that a roommate arrangement is most clearly distin-

guishable from a(sub)lease. In the typical sublease scenario, the sublessor is absent for some period less than the full term of the lease, and thus transfers possession and her interest for that period to the sublessee. In contrast, a licensor does not cede exclusive possession or transfer her interest, but instead shares possession. *See American Jewish Theater v. Roundabout Theatre Co., Inc.*, 203 A.D.2d 155, 610 N.Y.S.2d 256, 257 (1st Dept.1994) ("The nature of the transfer of absolute control and possession is what differentiates a lease from a license or any other arrangement dealing with property rights."); *Roberts v. Lynn Ice Co.*, 187 Mass. 402, 73 N.E. 523, 524 (1905) (question of whether an agreement concerning use of real property is a lease or a license depends on whether the agreement cedes exclusive possession from one party to the other). *See generally* 49 Am.Jur.2d § 21 (discussing distinction between lease and license).

19. The Dissent's argument that the application of the *Kapiolani* and *Bush* factors here yields the conclusion that the agreement was a(sub)lease is

that the agreement between Ayau and Adams constituted a license revocable at will rather than a sublease.[20]

B. *Adams Became a Trespasser When the Right to Possession of His Licensor Ayau Terminated.*

 From this point, the analysis is straightforward. First, a license is revocable at the will of the licensor. *See Bush*, 81 Hawaiʻi at 487, 918 P.2d at 1143 (key feature of a license is that it is revocable at the will of the licensor) (citing 2 R. Powell and P. Rohan, Powell on Real Property § 34.25 at 34–298 through 34–301 (1995)). Second, a license cannot continue to exist after the licensor's own interest in the land has been extinguished. *Cf. McCandless*, 11 Haw. at 789 (license is automatically revoked by sale

of the land and ceases upon the death of either party). Here, evidence was adduced to show that Ayau gave notice to Adams both of her intent to revoke the Ayau–Adams agreement and of the impending termination of the Ayau–Kiehm agreement.[21] Moreover, it was the undisputed finding of the court that the Ayau–Kiehm lease agreement did in fact terminate on March 31, 2002. Accordingly, Adams' license terminated no later than March 31, 2002, the last day of the licensor Ayau's interest in the property. As of April 1, 2002, therefore, Adams was a trespasser without right to possession. As such, he was not entitled to any notice to vacate from Kiehm; rather, it was Kiehm who was entitled to summary possession, ejectment, or other remedy to remove Adams.[22] Therefore, the judgment of the

unpersuasive. 109 Haw. at 307–08, 126 P.3d at 350–51. First, there is no support in the record for the proposition that Adams had an agreement with Ayau for *exclusive* possession of a *distinct* part of the residence. Even assuming that the district court's finding that Adams "rent[ed] part of the residence" can be taken to imply that the "part" was distinct, there is no evidence, direct or circumstantial, that Adams had *exclusive* possession of such part (*i.e.*, that Ayau was not allowed to go into his room or part). Rather, the evidence (*i.e.*, prior romantic relationship; Ayau's constant threats to throw Adams out; Ayau's statement that no sublease was intended) shows that Ayau never intended to or did cede exclusive possession or control of any part of the residence to Adams. As set forth above, the same evidence also supports the conclusion that Adams' license was not assignable.

Also, the Dissent appears to confuse the provisions of the Code with the nature of the rental agreement when considering the term of the agreement. 109 Haw. at 308, 126 P.3d at 351. There is no evidence in the record that the oral agreement between Ayau and Adams was intended to have any fixed term—that Adams paid $500 per month for his license does not make it a fixed-term agreement any more than a year-to-year license to erect a sign prevents the licensor from removing the sign and cancelling the license at its discretion. *See Baseball Publishing Co. v. Bruton*, 302 Mass. 54, 18 N.E.2d 362, 364 (1938) (holding on those facts that "[t]he revocation of a license may constitute a breach of contract, and give rise to an action for damages. But it is nonetheless effective to deprive the licensee of all justification for entering or remaining upon the land.") (Citations omitted.). Although the Dissent is correct in noting that, by operation of law, section 521–22 of the Code specifies that the term of a tenancy is month-to-month where no other period is specified, 109

Haw. at 308, 125 P.3d at 351, and thus termination by the landlord in the instant case may have required forty-five days' advance written notice under section 521–71(a) of the Code, 109 Haw. at 311, 126 P.3d at 354, that suggests only that the Code has displaced the common law with respect to the *termination* of licensing agreements (a possibility which we recognize, but dismiss as not pertinent to this case, see *infra* note 21), see 109 Haw. at 312, 126 P.3d at 355, not the essential *nature* of the agreements as licenses.

20. This is not to say, however, that a roommate may never be a(sub)lessee or that parties are not free to contract out of the default common-law rules regarding notice and termination. We hold only that on these facts, and in the absence of any oral or written agreements with Ayau or Kiehm to the contrary, Adams was the holder of a license revocable at will.

21. To the extent that the Code has displaced the common law regarding termination of licenses and Adams did not receive adequate notice of termination from Ayau, that would give Adams a claim only against his licensor/landlord, Ayau. On the other hand, Adams would have no claim against Kiehm because she was not initially a party to a rental agreement with Adams and never became party thereto because the doctrine of surrender is inapplicable to licenses in that, as set forth above, a license is terminated when the licensor's right is extinguished and even improper termination does not give the licensee a right to remain on the property. Accordingly, we need not consider the issue further herein.

22. We agree with the ICA majority's application of HRS § 666–1 to the instant facts, 109 Haw. at 286, 125 P.3d at 507, and hold that Adams was a

court was correct and the ICA erred in concluding otherwise.

### IV. CONCLUSION

For the foregoing reasons, the ICA's April 30, 2004 opinion is reversed and the August 21, 2002 final judgment and August 29, 2002 writ of ejectment of the court are affirmed.

Dissenting Opinion by ACOBA, J.

I respectfully dissent.

I believe that in conformance with the Residential Landlord Tenant Code (the Code), (1) rental agreements existed between Respondent/Plaintiff–Appellee Susan Kiehm (Kiehm) and Tammy Ayau (Ayau) as well as between Ayau and Petitioner/Defendant–Appellant Ian Adams, and, thus, (2) Adams was a sublessee of Ayau. In my view, the majority's holding that Adams was a licensee cannot be sustained under the Code's provisions. The majority acknowledges the broad definition of "rental agreement" in Hawai'i Revised Statutes (HRS) § 521–8, but chooses to focus on the language of HRS § 521–3(b) which refers to "right[s], remed[ies] and obligation[s] arising out of [rental agreements that are] not provided for" under HRS chapter 521, the Residential Landlord Tenant Code. *See* majority opinion at 302, 126 P.3d at 345.

From this the majority concludes that the Code "contemplates tenancies or arrangements other than leaseholds" and is "supplemented by the common law." Majority opinion at 302, 126 P.3d at 345. The majority then applies the common law, concluding that Adams is not a sublessee. Majority opinion at 303–04, 126 P.3d at 346–47. But the Code at HRS § 521–3 instructs, in part, that *"[u]nless displaced by the particular provisions of this chapter, the principles of law and equity, including the law relative to ... real property, ... supplement its provisions."* (Emphases added.)

The broad language of HRS § 521–8 states that " '[r]ental agreement' means *all* agreements, written or oral, which establish or modify the terms, conditions, rules, regula-

"person holding under the lessee or tenant [*i.e.,* Ayau]," not a "tenant [of Kiehm] by parol" enti-

tions, or any other provisions concerning the use and occupancy of a dwelling unit and premises." (Emphasis added.) On its face this definition encompasses the arrangement between Ayau and Adams. Hence, as to this arrangement, as discussed herein, the Code *does* displace "principles of law and equity including the law relative to ... real property." Inasmuch as the Code displaces such principles, the common law by way of licenses or otherwise cannot "supplement" the Code provisions as the majority proposes.

The majority's reasoning requires, in my view, a departure from the plain and unambiguous language of the Code and calls into question its application in future cases. With all due respect, the majority's approach is not countenanced by the Code, raised by the parties, or considered by the court or the Intermediate Court of Appeals (the ICA). If any hardship for the landlord is perceived in the specific circumstances of this case, the command of the Code is plain: that tenants may sublet their premises and, thus, the protections of the Code are afforded to a sublessee, unless the landlord requires that its consent to a sublease be given. *See* HRS § 521–37 (1993), *infra.* By its decision, the majority deprives sublessees of the Code's express protections. For the reasons stated herein, I would reverse the April 30, 2004 majority opinion of the ICA, vacate the August 21, 2002 judgment and August 29, 2002 writ of ejectment and remand the case to the district court of the third circuit (the court) in accordance with the discussion *infra.*

### I.

As the ICA stated, the Code applies in this case. HRS § 521–6 (1993) provides that "[t]his chapter applies to rights, remedies, and obligations of the parties to any residential rental agreement where made of a dwelling unit within this State." HRS § 521–3 (1993) states, in part that

(b) *Every legal right, remedy, and obligation arising out of a rental agreement not provided for in this chapter shall be regulated and determined under chapter*

tled to ten days' notice to quit from Kiehm.

*666* [Landlord and Tenant], and in the case of conflict between any provision of this chapter [(HRS chapter 521)] and a provision of chapter 666, this chapter shall control.

(Emphasis added.) HRS § 521–8 (1993), entitled "Definitions," provides in relevant part that:

"Landlord" means the owner, lessor, *sublessor,* assigns or successors in interest of the dwelling unit or the building of which it is a part and in addition means any agent of the landlord.

. . . .

"Tenant" means *any person who occupies a dwelling unit* for dwelling purposes under a rental agreement.

(Emphases added.) HRS § 521–22 (1993) provides in part that in the absence of an agreement in writing, a tenancy shall be month to month. HRS § 521–37 (1993), entitled "Subleases and assignments," provides in relevant part that unless otherwise agreed to, a tenant may sublet the dwelling unit without the landlord's consent:

(a) *Unless otherwise agreed to in a written rental agreement* and except as otherwise provided in this section, the *tenant may sublet the tenant's dwelling unit* or assign the rental agreement to another *without the landlord's consent.*

. . . .

(c) A written rental agreement may provide that the tenant's right to sublet the tenant's dwelling unit or assign the rental agreement is subject to the consent of the landlord.

(Emphases added.)

With respect to termination of a rental agreement, HRS § 521–71(e) (Supp.2004) states, in part, as follows:

Whenever the term of the rental agreement expires, whether by passage of time, *by mutual agreement, by the giving of notice as provided in subsection (a), (b),* (c), or (d) or by the exercise by the landlord of a right to terminate given under this chapter, if the tenant continues in possession after the date of termination without the landlord's consent, the tenant shall be liable[.]

(Emphasis added.)

## II.

For convenience, the relevant findings of fact (findings) of the court are reiterated here:

3. [Kiehm] agreed to rent the residence to . . . Ayau for $1000 per month on a month to month tenancy approximately two and one-half years ago. This was an oral agreement.

4. . . . Ayau agreed to pay electric and cable. [Kiehm] agreed to pay for water service.

5. In approximately November 2000, . . . *Ayau entered into an agreement with [Adams] to rent part of the residence for $500 per month.*

6. [Kiehm] was landlord and . . . Ayau was the tenant.

7. [Kiehm] and Ayau's month to month tenancy was terminated by oral agreement effective March 31, 2002.

8. Ayau notified Adams that their agreement would end at that time.

9. . . . Ayau received cash from [Adams] and deposited the rent into [Kiehm's] bank account.

10. After termination of the tenancy, [Adams] refused to move out.

11. There was no agreement between [Kiehm] and [Adams].

(Emphasis added.)

The relevant conclusions of law (conclusions) of the court are as follows:

1. *A sublease is a transfer of part of the leasehold term or premises.*

2. There is no privity between landlord and sublessee.

3. *[Kiehm] and [Adams] had no agreement.*

4. A landlord has no rights against a sublessee, and a sublessee has no rights against a landlord arising out of a landlord/tenant relationship.

5. When the month to month lease terminates, the sublease terminates.

6. [Adams] was not entitled to possession upon termination of the lease between Ayau and [Kiehm].

. . . .

9. [Adams] is trespassing on the property owned by [Kiehm].

10. [Kiehm] is entitled to a judgment and a writ of ejectment against [Adams].

(Emphases added.) Judgment and the writ of ejectment were filed against Adams as aforesaid.

### III.

Based on the provisions set forth previously, the Code broadly applies to "*any* residential rental agreement where made of a dwelling unit." HRS § 521–6 (emphasis added). Under *undisputed* finding no. 3, Kiehm and Ayau had such an "agreement" inasmuch as Ayau "rent[ed] the residence . . . for $1000 per month on a month to month tenancy." Similarly, *undisputed* finding no. 5 indicates Ayau and Adams also had such an "agreement" because Adams "rent[ed] *part of the residence for $500 per month.*" (Emphasis added.) Thus, the Kiehm/Ayau agreement constituted a "rental agreement" for Ayau to "occupy" the property owned by Kiehm as a "dwelling unit." Under the provisions of the Code, then, the Ayau/Adams agreement also constituted a "rental agreement" for Adams to "occupy" the property being rented by Ayau, *i.e.,* the property owned by Kiehm.

Kiehm, as "owner . . . of the dwelling unit" pursuant to HRS § 521–8, was the "landlord" of Ayau. Because Ayau "occupie[d the] dwelling unit for dwelling purposes under a rental agreement," she was a "tenant" of Kiehm pursuant to HRS § 521–8. Inasmuch as Ayau had a rental agreement with Adams

that allowed Adams to occupy the same unit, under the Code provisions Ayau was a "sublessor . . . of the dwelling unit" and, therefore, a "landlord" pursuant to HRS § 521–8 with respect to Adams. It follows that Adams was a "tenant" because he "occupie[d] a dwelling unit, [Kiehm's property] for dwelling purposes under a rental agreement[, the Ayau/Adams rental agreement]." HRS § 521–8.

### IV.

There being no finding that there was "[a] written rental agreement . . . provid[ing] that the tenant's [(Ayau's)] right to sublet the tenant's dwelling unit" was "subject to the consent of the landlord [(Kiehm)]," HRS § 521–37(c), under the express provision of the Code, Ayau could "*sublet* the tenant's [(Ayau's)] dwelling unit . . . to another without the landlord's [(Kiehm's)] consent." HRS § 521–71(a) (emphasis added). As the court concluded in *unchallenged* conclusion no. 1, "[a] sublease is a transfer of part of the leasehold term or premises." *See also Merriam Webster's Collegiate Dictionary* 1172 (10th ed. 1993) ("Sublet" is "to lease or rent all or part of a leased or rented property."); *Black's Law Dictionary* 1425 (6th ed.1990) (defining sublease as including a "[t]ransaction whereby tenant grants interests in leased premises less than his own"). Because Ayau had "sublet" or "rent[ed] . . . part of [the] rented property [(Kiehm's property)]" to Adams, *see* undisputed finding no. 5, Adams became a sublessee of Ayau.[1] Hence, under the comprehensive definition of "rental agreement" in HRS § 521–8, there is no basis for supplementing the Code with common law concerning "licensing" in this case.[2]

1. According to the ICA, HRS § 666–1 "recognizes that a *sublessee* (subtenant) is a 'person holding under the lessee or tenant[.]' [The Code] . . . did not alter that subordinate relationship." 109 Haw. at 282, 125 P.3d at 503 (emphasis added). The plain language of the Code would seem dispositive of Adams' sublessee status.

2. The majority's assertion that a month to month tenancy is one where no lease is involved, majority opinion at 302, 126 P.3d at 345 n. 14, simply restates the Code's equivalent proposition that in the absence of a written agreement a tenancy

shall be month to month, HRS § 521–22. On the other hand, the conclusion that the Code applies in this case is inclusive of the Code's recognition of subleases, *see* HRS § 521–37, the undisputed finding no. 5 that Adams rented part of the premises and unchallenged conclusion no. 1 to the effect that a sublease may be for a part of the premises, and that such a definition of a sublease comports with common understanding, *Webster's Third New Int'l Dictionary* (1961) 1172, *see also* HRS § 1–14 (stating that words found in a law are to be given "their most known and usual signification" or their common significa-

## V.

The majority reaches its decision without respect to the foregoing *undisputed* findings and without declaring the findings to be clearly erroneous or *unchallenged* conclusion no. 1 wrong. Yet, by virtue of these findings, the arrangements were plainly "rental agreement[s]," and the Code applied pursuant to HRS § 521–6. Indeed, the majority's test for a licensee arrangement is inapposite.

## A.

The majority states that the first test factor is whether "the grantee [has] the right to occupy a distinct and separate part of the premises (*i.e.*, a definite parcel)[,]" majority opinion at 303, 126 P.3d at 346, and that Adams did not have exclusive possession of the property, thus leading to the conclusion that he was a licensee, majority opinion at 303, 126 P.3d at 346. However, as mentioned, under undisputed finding no. 3, Kiehm and Ayau had such an "agreement" inasmuch as Ayau "rent[ed] the residence[.]" Similarly, undisputed finding no. 5 indicates Ayau and Adams also had such an "agreement" because the court found Adams "rent[ed] *part of the residence* for $500 per month." (Emphasis added.) In conjunction with its findings the court concluded, as noted previously, that a sublease may be for a part of the premises. The court thus deter-

mined that Adams in effect "[had] the right to occupy a distinct and separate part of the premises." Majority opinion at 303, 126 P.3d at 346.

As to the second factor, that "the grantee's right to possession [is] assignable," *see* majority opinion at 303, 126 P.3d at 346, the record is simply devoid of any findings. Because none of the parties, the court, or the ICA considered the subject arrangement to be a license, at the very least this factor cannot be determined as a matter of law without a remand to the court to make appropriate findings.[3]

As to the third factor, the majority is incorrect in concluding that the agreement was not for a fixed term. Finding no. 3 stated that Ayau rented the premises from Kiehm on a month to month tenancy. According to finding no. 5, Ayau rented part of the same premises to Adams for $500 a month. This indicates that Adams had a month to month tenancy. *See supra* note 2. In any event, HRS § 521–22 provides, in absence of a written agreement as to a term, that "the tenancy *shall* be month to month." (Emphasis added.) Hence, the Ayau/Adams agreement was fixed as a month to month tenancy.[4]

## B.

The sources from which the majority derives its three-prong test for distinguishing a

tion "without attending so much to [their] literal and strictly grammatical construction"), and the "legal dictionary meaning of sublease," majority opinion at 302, 126 P.3d at 345 n. 14, *Black's Law Dictionary* 1426 (6th ed.1990).

3. The majority asserts the second factor was satisfied without declaring the court's finding no. 5 clearly erroneous. In doing so, it rests simply on its speculation "that Ayau never intended to or did cede exclusive possession or control of any part of the residence to Adams." Majority opinion at 303, 126 P.3d at 347 n. 19. This assertion is obviously subject to an opposing interpretation—that because of the animosity between Ayau and Adams, Ayau did cede and Adams did assert possession of separate parts of the apartment. But such supposition either way is an inherently faulty course to follow which is why deference is given to findings of the trial court, *i.e.*, that Ayau rented "a part of the residence" to Adams, and why on appeal our review is limited.

4. Contrary to its imputation, it is the majority that "confuse[s]" the Code provisions and the rental agreement with respect to "the term of the agreement." Majority opinion at 303, 126 P.3d at 347 n. 19. As mentioned above, the court did make findings and rendered a conclusion indicating a month to month tenancy existed. *See* discussion, *supra*, and note 2. Assuming, *arguendo*, there is "no evidence in the record that the oral agreement between Ayau and Adams," majority opinion at 303, 126 P.3d at 347 n. 19, had a "fixed term," the Code imputes a "month to month" term under HRS § 521–22. The Code applies because, as the court in undisputed finding no. 5 found, "Ayau entered an agreement with Adams to rent[ ]" and therefore, the Code, *i.e.*, HRS § 521–22, was not supplemented by the common law. Hence, the lack of a written agreement does not mean that there was no fixed term, as the majority declares in asserting that there was instead a license. *Id.* With all due respect, such a declaration can only be made by not considering the undisputed findings and unchallenged conclusions of the court.

lease from a license also have questionable application. The majority bases its conclusion on definitions not found in the Code. *Kapiolani Park Preservation Soc'y v. City & County of Honolulu*, 69 Haw. 569, 570–71, 751 P.2d 1022, 1024 (1988), involved an agreement to erect a restaurant on land subject to a charitable trust. The majority applies a test used in a case involving a commercial lease to the instant case, one involving a residential lease. *Bush v. Watson*, 81 Hawai'i 474, 918 P.2d 1130 (1996), is similarly distinguishable. *Bush* involved a challenge to third party agreements "whereby the lessee of an agricultural homestead allows[ed] a stranger to the lease to use his or her land for farming or pastoral purposes" under the Hawaiian Homes Commission Act. *Id.* at 476–77, 918 P.2d at 1132–33. Again, the source of the majority's test involves a commercial, agricultural arrangement, as opposed to a residential one. While involving a residential arrangement, *Harkins v. Win Corp.*, 771 A.2d 1025 (D.C.2001), arose in the context of a rooming hotel in which occupants rented individual rooms. In *McCandless v. John Ii Estate, Ltd.*, 11 Haw. 777 (1899), a rental agreement existed whereby land used for the pasturing of cows and heifers was to be leased to the Oahu Sugar Company to remove water. The majority's reliance on these cases is misplaced as they are factually distinguishable and not based on a landlord-tenant residential code.[5]

### C.

The majority decides that "there is case law in this jurisdiction on point," majority opinion at 302, 126 P.3d at 345 n. 16, referring to its statement that "[a]t common law,

a roommate is not considered a sublessee. *See Brewer v. Chase*, 3 Haw. 127, 139 (1869)[.]" Majority opinion at 303, 126 P.3d at 346. With all due respect the statement assumes the answer to what is in issue, for the question is whether Adams was a "roommate" as the majority asserts, or a sublessee as the court and the ICA decided, and as the Code, in my opinion, plainly indicates.

Moreover, *Brewer* does not appear remotely relevant. In that case, the plaintiff and the defendant entered into a lease under which the defendant occupied the plaintiff's building. The lease contained a provision that the defendant could not "sub-let or transfer any of the privileges of this instrument to any other party." 8 Haw. App. at 129. The defendant opened a drug store in the building. *Id.* at 130. The defendant allowed a Dr. McGrew to occupy two rooms in the building, which Dr. McGrew used to see patients. *Id.* Dr. McGrew testified that he occupied two rooms in the building "not exclusively," and that the defendant occupied the two rooms with him. *Id.* He further indicated that there was no written agreement as to his use of the two rooms. *Id.* Dr. McGrew did not pay the defendant any rent for the use of the building, but rather referred his patients to defendant for their medication. *Id.* This court held that the defendant did not breach the lease by allowing Dr. McGrew to occupy the building with him in this way. However, it was not held that Dr. McGrew was a licensee. Rather, this court characterized Dr. McGrew as a "lodger," and not as a licensee. *Id.* at 140.

The majority's reliance on *Brewer* for its proposition that "[a]t common law, a roommate is not considered a sublessee," majority

---

**5.** The majority cites to additional cases contending that "the lease-license distinction is equally applicable in a residential context." Majority opinion at 303, 126 P.3d at 346 n. 17. These cases, like the ones underlying the majority's three factor test, are distinguishable. In *445/86 Owners Corp. v. Haydon*, 300 A.D.2d 87, 751 N.Y.S.2d 456, 457 (2002), the mother-in-law of a tenant/shareholder living alone in a cooperative apartment subject to restrictions on who could live in the unit was considered a licensee. In *Har Holding Co. v. Feinberg*, 182 Misc.2d 180, 697 N.Y.S.2d 903, 904 (1999), the defendant had originally lived in a rent-stabilized apartment with two tenants, but then resided there as a sole

occupant for eleven years. This scenario, coupled with the fact that the landlord had refused to place the defendant's name on the lease, led to that court's conclusion that the defendant was a licensee. *Id.* Finally, in *Schell v. Schell*, 74 Cal. App.2d 785, 169 P.2d 654, 654–55 (1946), a couple was denied a divorce, but the wife retaining possession of the family home, converted the home into a partial rooming house. At 655. In reaching its conclusion that the roomers or lodgers were licensees and not tenants, that court noted that "[h]ousing conditions during the war period[,]" and expenses of caring for "minor children" had prompted her "to take in a few roomers[.]" *Id.* at 656.

opinion at 302, 126 P.3d at 345, is, at the least, misplaced. *Brewer* is inapposite because it involved a business arrangement between a doctor and a pharmacist in which no rent was paid, no term was involved, and *in which there was an express prohibition against subletting.*[6] *Brewer* is not a licensee case and does not support the majority's ultimate conclusion that Adams was a licensee. Majority opinion at 303–04, 126 P.3d at 346–47.

## VI.

### A.

Because I believe there was a sublease between Ayau and Adams, I consider the relevant arguments on appeal. Adams contended in his opening brief that (1) "the [c]ourt should have held that there is a residential landlord-tenant relationship between Adams (as tenant) and Kiehm (as landlord) governed by [HRS chapter] 521[,]" the Code, and that Adams "is a month-to-month tenant under [HRS] § 521–22";[7] (2) the court should have made "[a] specific finding ... that Adams was not given the required notice to terminate his sublease with Ayau"; and (3) Adams, and not Kiehm, is "entitled to possession" inasmuch as (a) "the voluntary termination of Ayau and Kiehm's lease does not terminat[e] Adams's sublease[,]" (b) by this "voluntary termination," Adams "bec[ame] the immediate tenant of Kiehm[,]" (c) "Adams is entitled to proper notice [from

6. Under the Code, of course, a tenant may sublease its premises in the absence of a written consent requirement. HRS § 521–37.

7. HRS § 521–22, entitled "Term of rental agreement," provides, in relevant part, that "[t]he landlord and tenant may agree in writing to any period as the term of the rental agreement. *In the absence of such agreement, the tenancy shall be month to month[.]* " (Emphasis added.)

8. HRS § 521–71(a) states as follows:

When the tenancy is month-to-month, the landlord *may terminate the rental agreement by notifying the tenant, in writing, at least forty-five days in advance of the anticipated termination.* When the landlord provides notification of termination, the tenant may vacate at any time within the last forty-five days of the period between the notification and the termination date, but the tenant shall notify the

Kiehm] under [HRS] § 521–71(a)[8] before his month-to-month tenancy may be terminated[,]" and (d) "Kiehm failed to provide adequate notice to terminate Adams's tenancy."

In his reply brief, Adams asserted in part that (1) assuming HRS § 666–1 applied, Kiehm failed to give him the ten days prior notice required to evict him and (2) even if Kiehm had given proper notice under HRS § 666–1, she failed to give him sufficient notice under the Code and specifically HRS § 521–71(a).[9]

### B.

On April 30, 2004, the ICA issued a published opinion remanding the case to the court.[10] With regard to the corresponding arguments in Adams' opening brief, the ICA indicated as to (1) that the Code applied but "does not require a lessor/landlord or a lessee/tenant to give notice to a sublessee/subtenant when terminating (in contrast to surrendering)" the rental agreement between the lessor/landlord and the lessee/tenant, and "in the absence of a contract to the contrary ..., all subleases ... terminate when the lease[ ] agreement terminates (in contrast to when the lease[ ] agreement is surrendered)." 109 Haw. at 283, 125 P.3d at 504. The ICA did not answer (2) directly but indicated Adams did not assert any claims against Ayau. With respect to (3)(a) and (b), the ICA related that under the common law,

landlord of the date the tenant will vacate the dwelling unit and shall pay a prorated rent for that period of occupation.
(Emphasis added.)

9. *See supra* note 8.

10. Previously, on October 8, 2003, the ICA issued a memorandum opinion affirming the August 21, 2002 judgment and the August 29, 2002 writ of ejectment. On October 15, 2003, Adams filed a motion for reconsideration. On October 22, 2003, the ICA issued an order granting Adams' motion for reconsideration and vacating the October 8, 2003 memorandum opinion. On November 13, 2003, the ICA filed a second memorandum opinion, again affirming the court's judgment and writ of ejectment. On November 25, 2003, Adams filed a motion for reconsideration. On December 3, 2003, the ICA issued an order granting reconsideration and vacating the ICA's second memorandum opinion.

"[t]he surrender of a lease by [the] lessee to [the] lessor ... will not ... defeat the estate of the sublessee[,]" 109 Haw. at 283, 125 P.3d at 504, and further, that "Adams' rights as a subtenant ... terminated upon the termination of Ayau's rights as a tenant[.]" [11] *Id.*, 109 Haw. at 285, 125 P.3d at 506. In connection with (3) (c), the ICA said that "Adams had no right to notice from Kiehm of the termination." *Id.*

As to Adams' assertion in his reply brief regarding HRS § 666–1, the ICA declared "Adams (1) was a 'person holding under the lessee or tenant, who held possession of lands ... without right[ [12] ] ... and (2) was not a 'tenant by parol' entitled to 'a notice to quit of at least ten days[.]' " *Id.*, 109 Haw. at 286, 125 P.3d at 507 (brackets omitted).

### VII.

#### A.

In my view, and as Adams argued, a specific finding by the court as to whether Ayau had given valid notice as landlord to terminate [13] the Ayau/Adams sublease should have been rendered by the court. For, as shown previously, under the Code, a lessee such as Ayau who sublets, is a sublessor and thus is deemed a landlord. HRS § 521–8. As indicated *supra*, Adams was a tenant of Ayau.

Because Ayau apparently attempted to give notice to Adams of termination of the sublease, she was required to adhere to the dictates applicable to landlords, *i.e.*, the giving of forty-five days' notice to Adams pursuant to HRS § 521–71(a). Hence, if Ayau chose to give notice as allowed under HRS § 521–71(e) to end the sublease before the

end of her lease with Kiehm, Ayau was required to give Adams forty-five days' written notice. Had she done this before Ayau's lease with Kiehm ended, Adams' sublease would have been properly terminated under one of the methods established in HRS § 521–71(e). Therefore, on remand, I would instruct the court to render a finding with respect to that matter.

In my view, the ICA erred, then, insofar as it indicated the Code does not require "a lessee ... to give notice to [a] sublessee ... when terminating (in contrast to surrendering) the lease ... between the lessor ... and the lessee." 109 Haw. at 283, 125 P.3d at 504. If termination is attempted or posited pursuant to HRS § 521–71(a) or (b), the Code controls, *i.e.*, "displaces," the common law relative to real property, HRS § 521–3, and the notice provision in HRS § 521–71(a) must be complied with if chosen as the mode of termination.

#### B.

Adams maintains that the "oral agreement [by Kiehm and Ayau] to terminate the main lease was not legally enforceable" under HRS §§ 521–71(a) and (b) because a written agreement was statutorily required. In my view, to the extent the ICA indicated "oral" notice would be sufficient in this regard, it was incorrect. Both statutory provisions employ the word "may" in instructing that a landlord or tenant is authorized to terminate a month-to-month rental agreement by advance notice. The term "may" means to "have permission to." *Merriam Webster's Collegiate Dictionary* at 719 (10th ed.1993). Applying the ordinary meaning [14] of the term

11. The effect of the statement that Adams' rights as a tenant terminated upon Ayau's rights as a tenant is unclear, inasmuch as the ICA remanded the case to determine whether Adams was entitled to remain as a tenant of Kiehm's under the doctrine of surrender.

12. In light of the ICA's order of remand, the effect of this statement by the ICA is unclear.

13. The term "termination" is not defined in the Code. The plain meaning of "termination" is "[e]nd in time or existence; close; cessation; conclusion," *Webster's Third New Int'l Dictionary* at 2359, and "[w]ith respect to a lease ..., term

refers to an ending, usually before the end of the anticipated term of the lease ..., which termination may be by mutual agreement or may be by exercise of one party of one of his remedies due to the default of the other party." *Black's Law Dictionary* at 1471.

14. This court has stated that when the verb "may" is used in a statute, the legislature intended that the term used "should carry [its] ... ordinary meaning[ ]." *Gray v. Admin. Dir. of the Court*, 84 Hawai'i 138, 149, 931 P.2d 580, 591 (1997) (quoting *In re Fasi*, 63 Haw. 624, 626–27, 634 P.2d 98, 101 (1981)) (citations omitted).

"may," HRS §§ 571(a) and (b) permit a landlord or a tenant to terminate a rental agreement in the manner prescribed in these statutory sections.

"May," however, does not modify the form in which notice to vacate must be given, *i.e.*, "in writing." On their faces, HRS §§ 521-71(a) and (b) require that if the ending of the lease is to be achieved by way of subsection (a) or (b), notice must be by writing. In light of the plain meaning to be given statutory language, the ICA's conclusion that "the tenant and the landlord, by *oral* or written agreement, may terminate their month-to-month rental agreement," 109 Haw. at 284, 125 P.3d at 505 (emphasis added), was wrong insofar as HRS § 521-71(b) mandates *written* notice of termination.

Adams, then, was correct to the extent he argued a writing is required under HRS §§ 521-71(a) and (b). However, I would add that because there was no privity of estate [15] or privity of contract [16] between Kiehm, the lessor, and Adams, the sublessee, *see* undisputed finding no. 2, Adams cannot legally raise an objection to the manner in which the month-to-month tenancy between Kiehm and Ayau was ended by them.

### VIII.

Contrary to Adams' argument, HRS § 521-71(e) did not prohibit Kiehm and Ayau from ending a tenancy by a mutual agreement that was verbally expressed, as may have been accomplished by Kiehm and Ayau. Under the common law, landlords had the right to terminate a rental agreement without cause. *See Sunset Mobile Home Park v. Parsons*, 324 N.W.2d 452, 459 (Iowa 1982) (holding that an Iowa statute permitting termination without cause, as long as the lease was not cancelled solely for the purpose of making the space available for another tenant, did not abrogate the landlord's common law right to terminate without cause). However, as a general matter the Code sets out methods by which a tenancy may be terminated, *see* HRS § 521-71, and, hence, has displaced such a right with respect to rental agreements.[17]

To reiterate, termination by written notice via HRS §§ 521-71(a) and (b) is not the only way in which a tenancy may be ended. For HRS § 521-71(e) also indicates, among other methods, that a term may expire by "mutual agreement." There is no requirement in HRS § 521-71(e) that a mutual agreement to end a lease, as contrasted to termination by advance notice, can only be expressed in writing, and, thus, Kiehm and Ayau were not prohibited from orally agreeing to termination of their lease.

### IX.

The ICA apparently applied HRS § 521-71(b) and assumed that if Ayau, as a tenant,

---

15. "Privity of estate" is "[m]utual or successive relation to the same right in property such as that which exists between lessor and lessee or their successors." *Black's Law Dictionary* at 1199.

16. "Privity of contract" is "[t]hat connection or relationship which exists between two or more contracting parties." *Hunt v. First Ins. Co. of Hawai'i*, 82 Hawai'i 363, 367, 922 P.2d 976, 980 (1996) (quoting *Black's Law Dictionary* at 1199).

17. As the ICA in the main indicated, under the common law the general rule was that "[a] subtenant has no greater rights against a landlord than the tenant, and the termination of a primary lease terminates the sublease." *Nat'l Shawmut Bank of Boston v. Correale Min. Corp.*, 140 F.Supp. 180, 184 (D.C.W.Va.1956) (deciding that termination of the primary lease operated to terminate the sublease where the primary lease was subject to forfeiture and the lessee agreed to surrender to the landlord). Given the landlord's right to terminate without cause at common law, such an action by the landlord would operate to terminate both the lessee and sublessee's lease. As the court in *Wehrle v. Landsman*, 23 N.J.Super. 40, 92 A.2d 525, 528 (Law Div.1952), affirmed, "anything which defeats the tenants' estate will defeat the subtenant's estate."

Moreover, in the event of a breach of the lease, "[w]hile it is true that a tenant cannot voluntarily surrender a lease to the prejudice of a subtenant, '[w]hen an unexpired lease has become subject to forfeiture and the lessee, under pressure from the landlord, surrenders to him possession of the leased premises, the surrender is not voluntary in the sense which would prevent it affecting the rights of a sublessee.'" *Nat'l Shawmut Bank of Boston*, 140 F.Supp. at 184. However, whether these common law principles have been displaced by specific rights, if any, retained by a sublessee in cases other than a surrender, *see* discussion *infra*, may require resort to provisions of the Code that have not been raised here.

ended the Kiehm/Ayau agreement with twenty-nine or more days notice to Kiehm, then such "facts present[ed] a termination" as opposed to a "surrender" of the Kiehm/Ayau agreement. 109 Haw. at 284, 125 P.3d at 505. But it is not evident from the record and the court made no finding of whether expiration of the Kiehm/Ayau lease came about, for example, by mutual agreement or, as the ICA posited, by Ayau giving notice as prescribed in HRS § 521–71(b). Indeed, the court determined in finding no. 7 that "[Kiehm] and Ayau's month to month tenancy was terminated by oral *agreement* effective March 31, 2002." (Emphasis added.)

Under one reading, this finding implies there was mutual agreement as to the end date of the lease rather than written notice from Ayau to Kiehm to end the lease under HRS § 521–71(b) as the ICA proposed. The distinction may be significant because, contrary to the ICA's statement in its remand order, under HRS § 521–71(e) no requirement of advance notice attaches to the ending of a lease by "mutual agreement." Thus, the ICA also erred in requiring findings be made on remand only with respect to HRS § 521–71(b), in the absence of foundational facts establishing that that subsection applied.

I therefore would instruct the court to determine upon remand the method by which the Kiehm/Ayau agreement was terminated under HRS § 521–71(e). For, as HRS § 521–71(e) instructs, "expir[ation]" of the lease may take place by various means, including by mutual agreement. If advance notice by Ayau to Kiehm as allowed by HRS § 521–71(b) was not the method employed to end the Kiehm/Ayau lease, then the determination by the court on remand of whether twenty-nine days had elapsed before the end of the lease, as the ICA required, would not be relevant to a disposition of the case.

## X.

Assuming that Ayau failed to give forty-five days notice to Adams to vacate under the sublease, the issue for purposes of determin-

ing whether there was a surrender is when the Kiehm/Ayau agreement began. The ICA referred to the legal dictionary meaning of "surrender," which necessitates a determination of whether the tenant "voluntarily g[a]ve up possession of the premises prior to the full term of the lease and the landlord accepted ... with [the] intent that the lease be terminated." [18] 109 Haw. at 282–83, 125 P.3d at 503–504. Because the Code is silent as to the sublessee's status in the situation where the lessee gives up possession before the term of the lease ends and the lessor accepts, the Code does not displace the common law as to a "surrender."

Under the common law, "[t]he general rule is that the rights of a subtenant cannot be affected by a voluntary surrender of the master lease." *Northridge Hosp. Found. v. Pic 'N' Save No. 9 Inc.*, 187 Cal.App.3d 1088, 1094–95, 232 Cal.Rptr. 329 (2d Dist.1986). Similarly, in *Duane Reade v. I.G. Second Generation Partners, L.P.*, 280 A.D.2d 410, 411, 721 N.Y.S.2d 42 (N.Y.A.D.2001), that court recognized "the undisputed principle that a sublessor's voluntary surrender of the main lease does not impair the sublessee's rights but transforms the sublessee into the landlord's immediate tenant."

Hence, "[i]t seems to be universally held by the courts that the rights of [a] subtenant will not be destroyed or impaired by a surrender of the main lease." *Byrd v. Peterson*, 66 Ariz. 253, 186 P.2d 955, 958 (1947). For, "[i]t would be unconscionable where the express terms of a sublease have not been violated to allow the landlord and lessee to terminate the original lease by their mutual consent over the protest of the subtenant." *Id. See Goldberg v. Tri–States Theatre Corp.*, 126 F.2d 26, 32 (8th Cir.1942) (holding that the surrender of a lease by a lessee to his or her lessor, after a sublease, will not be permitted to operate so as to defeat the estate of the sublessee).

## XI.

But the court made no finding as to when a monthly period commenced under the

---

**18.** The term "surrender" is employed in HRS § 521–74.5 (1993) relating to a landlord's recov-

ery of a dwelling unit but does not otherwise appear to be discussed in the Code.

Kiehm/Ayau month-to-month tenancy. In accordance with the common law definition of "surrender," the beginning date of a monthly term must be established to ascertain whether Ayau as "the tenant voluntarily [gave] up possession of the premises *prior* to the full term of the lease." 109 Haw. at 283, 125 P.3d at 504 (emphasis added). Whether the Kiehm/Ayau lease was terminated by Ayau's advance notice to Kiehm as the ICA assumed, or was ended by mutual agreement,[19] it should be determined whether the undisputed end date of March 31 coincided with the end of a monthly term as designated under the Kiehm/Ayau month-to-month tenancy. If it did, then the Kiehm/Ayau lease must be deemed to have expired at the end of the term. In that event, Ayau would not have given up possession before the term of the lease had ended, and, hence, no surrender would have occurred. If a surrender did not occur, Adams retained no right to remain on the premises.

On the other hand, if the date upon which the agreement to end the Kiehm/Ayau lease did *not* coincide with the end of a monthly term as designated under the tenancy, then Ayau would have relinquished the premises prior to a full term of the lease ending. In such a case, a "surrender" under the common law would have occurred and Adams would have recourse under the common law. In the absence of a finding as to the date of the month at which the monthly term began under the Kiehm/Ayau month-to-month tenancy, it cannot be established whether a surrender took place under these facts.[20]

**19.** Because a mutual agreement to end a lease before the term ends is in effect a surrender, the rights of the sublessee are the same as when there is a surrender. *See Arrington v. Loveless,* 486 S.W.2d 604, 606 (Tex.Civ.App.1972) ("A surrender of a lease, as that term is used in the law of landlord and tenants, is the yielding up by the tenant of the leasehold estate to the landlord so that the leasehold estate comes to an end by the *mutual agreement* of the landlord and tenant." (Emphasis added.)); *Powell v. Jones,* 50 Ind.App. 493, 98 N.E. 646, 647 (1912) ("To relieve [the lessee] from liability for rent during the term of the lease, it must appear that there was a *surrender* of said lease, a *mutual agreement* between the parties that it should cease to be binding upon them." (Emphases added.)).

## XII.

Therefore, I would vacate the August 21, 2002 judgment and August 29, 2002 writ of ejectment and remand the case with instructions to the court to enter appropriate findings and conclusions, determining (1) whether Ayau gave sufficient notice pursuant to HRS § 521–71(a) to Adams to terminate the Ayau/Adams sublease before the end of the Kiehm/Ayau lease and if not, (2) the method by which the end of the Kiehm/Ayau term was effected pursuant to HRS § 521–71(e), (3) whether the Code requirements of the particular mode of expiration were satisfied, (4) the date of the month on which the monthly term under the Kiehm/Ayau term began, (5) whether the undisputed March 31, 2002 end date of the Kiehm/Ayau tenancy coincided with the end of a monthly term under the said tenancy or not, and (6) all claims and defenses as may be affected by such findings and conclusions.

**20.** As to the conclusions challenged, I would (1) affirm conclusion no. 1 and no. 3 as correct on their faces and (2) vacate conclusions nos. 5, 6, 7, 9, 10, 11, 12, 13, and 14 as dependent upon the matters to be decided on remand. As to finding no. 11, I would affirm, inasmuch as there was no evidence of an express agreement made between Kiehm and Adams. As to finding no. 8, I believe the phrase "at that time" is ambiguous and on remand must be clarified by the court. *See Forbes v. Hawaii Culinary Corp.,* 85 Hawai'i 501, 503, 946 P.2d 609, 611 (1997) (remanding and instructing the court to clarify its findings). Finally, because HRS chapter 666 applies only if the Code is silent with respect to any "right, remedy and obligation," HRS § 521–3, it is not evident whether HRS chapter 666 would apply pending the outcome of the case on remand.